102 F.3d 1551
 96 Cal. Daily Op. Serv. 9368, 96 Daily Journal
D.A.R. 15,411
Terry Allen LANGFORD, Petitioner-Appellant,
v.
Rick DAY, Acting Administrator of Corrections Division;
Joseph P. Mazurek, Attorney General of the State
of Montana, Respondents-Appellees.
 No. 95-99001.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Feb. 13, 1996.
Decided Dec. 24, 1996.
 
 Michael Donahoe, Helena, MT, for petitioner-appellant.
 John Paulson, Deputy Attorney General, Helena, MT, for respondents-appellees.
 Appeal from the United States District Court for the District of Montana, Charles C. Lovell, District Judge, Presiding. D.C. No.CV-91-00051-CCL.
 Before: CANBY, TROTT and HAWKINS, Circuit Judges.
 CANBY, Circuit Judge:
 
 
 1
 Terry Allen Langford, a Montana death-row inmate, appeals the denial of his habeas corpus petition under 28 U.S.C. § 2254 and the grant of summary judgment for respondents. Langford confessed to two murders, pleaded guilty, did not present mitigating evidence at the sentencing hearing, and asked for the death penalty. Soon after being sentenced to death, however, Langford obtained new counsel and moved to withdraw his guilty pleas. The Montana state courts denied his motion to withdraw his pleas and upheld his convictions and sentences.
 
 
 2
 On appeal, Langford argues that he received ineffective assistance of counsel from his first attorney, who counseled him through the guilty plea and sentencing phases of this case. He also argues that the Montana Supreme Court failed to consider and give effect to mitigating evidence at sentencing, that the Montana death penalty statutes are unconstitutional because of the manner in which they were enacted, and that death by hanging is a cruel and unusual method of execution.
 
 
 3
 We have jurisdiction over Langford's claims under 28 U.S.C. § 2253. We affirm.
 
 I. BACKGROUND
 
 4
 In July 1988, Montana authorities found the bodies of Edward and Celene Blackwood in their residence. The Blackwoods had been bound and shot, and Mrs. Blackwood's throat had been slashed. Certain items were missing from their house, including several guns with known serial numbers, and the Blackwood's pickup truck was also gone. The police entered the serial numbers of the guns into the National Crime Information Computer ("NCIC"). The truck was found a few days later about sixty miles away, and the police lifted latent fingerprints from inside its cab.
 
 
 5
 Later that month, Indiana authorities notified the Montana authorities that they had found a bag, containing the Blackwoods' guns, that was believed to have been abandoned by a fleeing suspect after an attempted robbery of a motel. The robbery suspect had registered at the motel as Terry Allen Langford and listed his residence as Raleigh, North Carolina. One of the guns in this bag later was determined to be the murder weapon. Langford was listed in the NCIC as a probationer in North Carolina. Montana and Indiana authorities secured Langford's fingerprints and photograph from the North Carolina authorities. The fingerprints matched those in the Blackwoods' truck. The photograph was identified as being that of the would-be robber in Indiana.
 
 
 6
 Warrants for Langford's arrest were issued in connection with the Indiana attempted robbery, and he was arrested in Raleigh, North Carolina. Upon this arrest, North Carolina police advised Langford of his Miranda rights, see Miranda v. Arizona, 384 U.S. 436, 478-79, 86 S.Ct. 1602, 1629-31, 16 L.Ed.2d 694 (1966), but Langford refused to sign a Miranda waiver form, stating that he did not want to waive any rights.[1] Consequently, the North Carolina authorities did not question Langford about the Indiana robbery or any other crime.
 
 
 7
 Three days later, the Montana police arrived to question Langford in the North Carolina jail. The Montana officers advised Langford of his Miranda rights, and Langford signed a written Miranda waiver. Langford then confessed to the murders of the Blackwoods. The Montana police transported Langford to Montana, and about three days later Langford appeared before a Montana Justice of the Peace on the charges that are the subject of this appeal.
 
 
 8
 An information then was filed in the Third Judicial District Court of Powell County, Montana (hereinafter "the state trial court"). That court appointed attorney Conde F. MacKay to represent Langford. During one of his meetings with MacKay, Langford said, "something might be wrong with me." MacKay then moved for psychiatric evaluation of Langford at the state hospital. Langford spent 54 days in the hospital. Although MacKay did not advise him that he had the right to remain silent during any psychiatric interviews, the hospital as a matter of course advised Langford that he had the right to remain silent and the right to meet with counsel, and Langford signed a form acknowledging that he had been so advised. The psychiatric report found that Langford was not suffering from a mental disease, disorder, or defect. Langford told a doctor at the hospital that he wished to plead guilty and seek the death penalty.
 
 
 9
 MacKay requested and received the Powell County investigative file on Langford's case, but the file did not contain much information about the North Carolina arrest on the Indiana charges. MacKay discussed the circumstances of the arrest with Langford, but Langford did not mention that he had refused to sign the first Miranda waiver form. MacKay discussed with Langford the possibilities of filing a motion to suppress his confession and of challenging the constitutionality of Montana's death penalty statutes. Langford told MacKay that unless MacKay could guarantee that Langford would not spend a great deal of time in prison, he wanted to plead guilty and seek the death penalty. MacKay told Langford that no attorney could give such a guarantee.
 
 
 10
 MacKay met with Langford often during the two to three months after he was released from the hospital and before he pleaded guilty. MacKay discussed defense options with Langford and urged him to think again about his decision to plead guilty, but Langford continued to insist on pleading guilty and seeking the death penalty. On January 5, 1989, Langford pleaded guilty, without a plea agreement, to the following charges: two counts of deliberate homicide, two counts of aggravated kidnapping, one count of aggravated burglary, one count of robbery, and one count of theft. After Langford pleaded guilty, MacKay advised the state trial court that Langford wanted all matters expedited and wanted the death penalty. The trial court ordered, over MacKay's objection, that a presentencing report be prepared.
 
 
 11
 Langford refused to be interviewed by the probation officer for the presentencing report. On the basis of the hospital evaluation of Langford's mental condition and an interview of Langford's father, the officer concluded that Langford was trying to portray himself in the worst possible light, and that it seemed that Langford was requesting the death penalty as retribution against his parents, with whom Langford had a poor relationship. The officer refused to make a sentencing recommendation because of his limited information.
 
 
 12
 At the sentencing hearing, Langford presented no mitigating evidence. MacKay advised the trial court that Langford wanted the death penalty. Langford testified at the sentencing hearing. He said he was motivated to ask for the death penalty because his lawyer told him his choices were either the death penalty or life in prison. He denied that he was seeking the death penalty as retribution against his parents. Langford said he would kill again if provoked. The sentencing judge asked him several questions, including some concerning his prior criminal history, which was not extensive. Langford testified that he regularly had used drugs, but that he was not using drugs at the time he committed the murders. Langford was twenty-two at the time he committed the crimes and at sentencing.
 
 
 13
 The state trial court sentenced Langford to death for the murders and the aggravated kidnapping counts. The aggravating factors were that Langford used a firearm in the commission of the offense, that the murders were part of a scheme that resulted in the death of two persons, and that Langford committed aggravated kidnapping that resulted in the death of two persons. The trial court said that it "searched the entire record for mitigating circumstances sufficiently substantial to call for leniency for this Defendant and there are no such mitigating circumstances." Specifically, the trial court found that Langford did not have an extensive prior criminal record. At the time of the murders, Langford was on probation for forgery and tampering with a vehicle. The trial court found that Langford's chances of rehabilitation and treatment were "virtually nonexistent." The state trial court also sentenced Langford to consecutive terms of imprisonment totalling 100 years on the other counts.
 
 
 14
 Initially, Langford did not appeal the sentence, but automatic review proceedings nevertheless commenced in the Montana Supreme Court pursuant to statute. Before any decision was rendered, Langford filed a notice of appeal, and that appeal was consolidated with the automatic review proceedings. Langford then moved to substitute his counsel, and the court granted the motion. Langford's new counsel moved to stay the appeal and remand the case to the state trial court for a hearing on Langford's motion to withdraw his guilty pleas. The Montana Supreme Court granted the motion.
 
 
 15
 The state trial court then held a hearing on Langford's motion to withdraw his guilty pleas. Langford's new counsel had obtained documents from the North Carolina authorities, which had previously not been in either the state's or defense's files. One of them, which counsel introduced at the hearing, was the first Miranda waiver form, indicating that Langford had refused to sign. The court also considered an affidavit of Langford, in which he stated that he would not have pleaded guilty if he had known that legal arguments could have been made to suppress his confession because of his refusal to sign the first Miranda waiver form. The affidavit also stated that Langford did not discuss the circumstances of the North Carolina arrest with MacKay, and that he had not known the importance of the refusal to sign the waiver form. The affidavit further stated that the psychiatric hospital personnel did not tell Langford that he had a right to remain silent, nor was he aware that he may have had a right to be evaluated by another psychiatrist to prepare his defense.
 
 
 16
 Langford's first attorney, MacKay, testified in person. He stated that he did not recall ever seeing the first Miranda waiver form, and that Langford had told him that he knew of his rights. He stated that, whenever he discussed possible strategy options or further investigation, Langford stated that he knew what he was going to do and wanted MacKay to make sure no one interfered with his decision.
 
 
 17
 The state trial court denied Langford's motion to withdraw the guilty pleas, finding that Langford would not have entered different pleas even if MacKay had advised him in the manner that new counsel asserted he should have, and that Langford therefore suffered no prejudice as a result of any alleged ineffectiveness of MacKay's assistance. The state trial court found that Langford pleaded guilty because he preferred the death penalty to spending a long time in prison.
 
 
 18
 The Montana Supreme Court affirmed the convictions and sentences. State v. Langford [Langford I], 248 Mont. 420, 813 P.2d 936 (1991). The court rejected the claim that MacKay had been ineffective. It pointed out that there was no evidence that Langford told MacKay that he initially had refused to waive his rights, and that MacKay otherwise had explored suppression of the confession and attacks on the constitutionality of the Montana death penalty. Id. 813 P.2d at 947. Langford had never placed his sanity in issue, so there was no need to seek appointment of a defense psychiatrist pursuant to Ake v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985). The court stated that it was important to note that, at the time that MacKay was rendering his assistance as counsel, Langford was insisting on pleading guilty and seeking the death penalty. Langford I, 813 P.2d at 947.
 
 
 19
 The Montana Supreme Court also rejected Langford's argument that the state trial court failed properly to consider mitigating factors contained in the presentence report and state hospital report. Id. at 949-50. The supreme court agreed with the trial court's suggestion that the only potentially mitigating circumstance was the lack of an extensive criminal record, but stated that this factor does not necessarily require leniency. The court stated:In light of the facts regarding these two homicides, Langford's statement that he considered killing two other people after the Blackwoods' homicides, and his statement that he would kill again if provoked, we hold that the District Court did not err in holding that lack of an extensive, violent criminal record was not sufficiently substantial to merit leniency.
 
 
 20
 Id. at 951.
 
 
 21
 Finally, the Montana Supreme Court rejected Langford's argument that the Montana death penalty had not been properly enacted in the manner required by the state constitution. Id. at 951-52. The court therefore affirmed the trial court's denial of the motion to withdraw the guilty pleas, and ordered that a new date of execution be set. Id. at 952-53.
 
 
 22
 During the pendency of his appeal to the Montana Supreme Court, Langford had filed with that court a petition for postconviction relief. The court stayed the postconviction proceedings pending the completion of his direct appeal. See State v. Langford (Langford II), 249 Mont. 385, 819 P.2d 151, 151 (1991). In the postconviction petition, Langford again argued that the Montana death penalty statutes violated the state constitution. The state supreme court denied the petition, noting that it had already rejected Langford's state constitutional arguments.
 
 
 23
 Langford filed a second state postconviction relief petition raising the same state constitutional issue, but adding an argument that the court had denied Langford due process and equal protection by failing to give him the benefit of a state court precedent that Langford believed to be controlling. The state supreme court also denied this petition, in an unpublished order, holding that, "based on res judicata, this Court will not reconsider this issue.... Additionally, we wish to note that the issues raised by Langford in his second petition for post-conviction relief should have been addressed in a petition for rehearing following our decision in Langford I," a petition which Langford had failed to file.
 
 
 24
 Langford moved in state court for a declaration that hanging was an unconstitutional method of execution. The state trial court denied the motion as moot because Langford had chosen hanging rather than the other available alternative method of lethal injection. State v. Langford (Langford III), 254 Mont.44, 833 P.2d 1127, 1127-28 (1992). The Montana Supreme Court affirmed the trial court's order on appeal for the same reason. Id. 833 P.2d at 1129.
 
 
 25
 In December 1991, Langford filed his petition for writ of habeas corpus in the federal district court. The district court conducted a limited evidentiary hearing to determine whether MacKay had provided ineffective assistance by failing to advise Langford that he had a right to remain silent at the psychiatric evaluation. The district court held that MacKay's failure to advise could have caused no prejudice because Langford was properly advised by the hospital staff. The district court held that the state courts had held a full and fair evidentiary hearing with regard to all other allegations of ineffective assistance.
 
 
 26
 The district court granted respondents' motion for summary judgment and denied Langford's petition for writ of habeas corpus. The district court rejected all of Langford's claims of ineffective assistance, primarily because "Langford would have pleaded guilty no matter what his counsel did." The district court found no constitutional error in the state courts' treatment of mitigating factors in sentencing. It also found no error in the rulings that Langford had defaulted on his due process and equal protection claims, or that hanging did not violate the Eighth Amendment.
 
 II. ANALYSIS
 
 27
 We review de novo the district court's decision to deny Langford's writ of habeas corpus.[2] Calderon v. Prunty, 59 F.3d 1005, 1008 (9th Cir.1995); Reiger v. Christensen, 789 F.2d 1425, 1427 (9th Cir.1986). On this appeal, Langford challenges both the state courts' denial of his motion to withdraw his guilty plea and his sentence.
 
 A. The Guilty Plea
 
 28
 Langford's challenge to his guilty plea is based on his claim of ineffective assistance of counsel. We review that issue de novo. Moran v. Godinez, 57 F.3d 690, 699 (9th Cir.1994), cert. denied, --- U.S. ----, 116 S.Ct. 479, 133 L.Ed.2d 407 (1995); see also Strickland v. Washington, 466 U.S. 668, 698, 104 S.Ct. 2052, 2070, 80 L.Ed.2d 674 (1984). Langford received ineffective assistance of counsel if his counsel's performance fell below an objective standard of reasonableness, and there was a reasonable probability that, but for counsel's errors, Langford would not have pleaded guilty and instead would have insisted on going to trial. Hill v. Lockhart, 474 U.S. 52, 59, 106 S.Ct. 366, 370-71, 88 L.Ed.2d 203 (1985); Strickland, 466 U.S. at 687, 104 S.Ct. at 2064. Langford contends that his claim meets both requirements. He also asserts that the district court improperly accorded a presumption of correctness to several state court findings of fact. We address the two arguments in order.
 
 1. Ineffective Assistance of Counsel
 
 29
 The fact that overshadows this case is that Langford strongly and repeatedly insisted on pleading guilty and seeking the death penalty. That fact does not does not mean that Langford loses his right to effective assistance of counsel; his plea must be not only voluntary but intelligent, see, e.g., Boykin v. Alabama, 395 U.S. 238, 242, 89 S.Ct. 1709, 1711-12, 23 L.Ed.2d 274 (1969), and counsel's advice enters into the determination of intelligence. Counsel's advice must be "within the range of competence demanded of attorneys in criminal cases." McMann v. Richardson, 397 U.S. 759, 771, 90 S.Ct. 1441, 1449, 25 L.Ed.2d 763 (1970).
 
 
 30
 The typical challenge to a guilty plea entered by a defendant represented by counsel, however, is to a plea entered upon advice of counsel. In that situation, the Supreme Court has required that counsel's advice be within the McMann standard. See, e.g., Hill, 474 U.S. at 56-57, 106 S.Ct. at 369-70. In this case, Langford made it clear to his attorney, MacKay, that he was going to plead guilty and seek the death penalty unless MacKay could guarantee that Langford would not spend a long time in prison-a guarantee that MacKay correctly said no attorney could give. We do not recite this fact to suggest that Langford is any the less entitled to assistance of counsel "within the range of competence demanded of attorneys in criminal cases" as required by McMann. But here the focus is not on an attorney's advice to plead guilty; it is on MacKay's investigation of the case and advice regarding possible defenses. Langford's insistence on pleading guilty and seeking the death penalty is not utterly without effect on the determination of what MacKay as a competent attorney was required to do. The "reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions." Strickland, 466 U.S. at 691, 104 S.Ct. at 2066. In addition, Langford's dogged insistence on pleading guilty most certainly has an effect on the determination whether different advice from MacKay would have led to a plea of not guilty. We conclude that, in the circumstances of this case, the Montana Supreme Court and the district court correctly determined that MacKay had not rendered services below the requisite standard of competence, and that, even if he had advised as Langford's current attorney urges, Langford still would have pleaded guilty.
 
 
 31
 Langford bases his claim of ineffective assistance on several matters. He points out that MacKay filed no motions on his behalf, except for the request for a psychiatric evaluation. He concedes that MacKay discussed the possibility of moving to suppress Langford's confession, but he states that MacKay failed to point out the possibility of invoking Edwards v. Arizona, 451 U.S. 477, 484-85, 101 S.Ct. 1880, 1884-85, 68 L.Ed.2d 378 (1981) (holding that if defendant invokes his right to counsel, then interrogation must cease and cannot be continued until defendant has the opportunity to speak with counsel).
 
 
 32
 MacKay did not discuss Edwards, however, because he was unaware that Langford had initially refused to waive his Miranda rights or that Langford might have thought he mentioned a lawyer but could not be sure. MacKay was unaware because Langford had not told him (and the waiver form marked "refused to sign" was not in the prosecution file delivered to MacKay). Langford told MacKay only that he had been read his rights, knew them, and had waived them and confessed.
 
 
 33
 The question, then, is whether MacKay's failure to discover that Langford had refused to waive his rights fell below the requisite standard of competence. We conclude that it did not. In Hill, for example, two concurring Justices pointed out that, if the defendant did not tell his attorney about a prior conviction, then there was no factual basis for contending that the attorney's failure to advise concerning the effect of the prior conviction was ineffective assistance. Hill, 474 U.S. at 61-62, 106 S.Ct. at 371-72 (White, J., concurring); see also Dooley v. Petsock, 816 F.2d 885, 890-91 (3d Cir.), cert. denied, 484 U.S. 863, 108 S.Ct. 182, 98 L.Ed.2d 135 (1987) (trial counsel not ineffective for failing to raise claims as to which his client had not supplied essential facts of which client was aware). Langford knew the facts; he did not convey them to MacKay even though they discussed Langford's arrest and confession. At least in the face of Langford's determination to plead guilty, MacKay was not bound to investigate the matter further. MacKay therefore did not violate the standard of competence in failing to discuss an Edwards-based motion.
 
 
 34
 Langford also argues that MacKay should have explored and discussed the possibility of suppressing the confession on the ground that there was a delay in arraignment. See State v. Benbo, 174 Mont. 252, 570 P.2d 894, 900 (1977). Langford contends that the Indiana, North Carolina, and Montana authorities worked together to deny him a prompt initial appearance. See United States v. Alvarez-Sanchez, 511 U.S. 350, ----, 114 S.Ct. 1599, 1604, 128 L.Ed.2d 319 (1994). Langford has made no showing, however, to support his contention that there was such a coordinated plan. In addition, Langford's present contention that MacKay should have pursued this alternative route to suppression of his confession must be viewed in the context of Langford's insistence, at the time, that he wanted no motions to suppress or other types of delay to interfere with his intended plea of guilty. We conclude that MacKay's performance with regard to this issue did not fall below the requisite level of competence.
 
 
 35
 Langford notes that MacKay failed to advise him that, under Ake, he possibly could have demanded and obtained an independent psychiatrist to aid in his defense. Langford has not shown, however, that his sanity was likely to be an issue in his case. See Ake, 470 U.S. at 83, 105 S.Ct. at 1096. The state hospital found that Langford was not suffering from any mental illness. The record furnishes no reason to believe that further psychiatric evaluation would have created an issue regarding Langford's mental competence. There is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. Campbell v. Wood, 18 F.3d 662, 673 (9th Cir.), cert. granted, 511 U.S. 1119, 114 S.Ct. 2125, 128 L.Ed.2d 682 (1994). MacKay's decision not to explore further the question of Langford's competence fell within that range.
 
 
 36
 Above all, moreover, stands the second Hill requirement-prejudice. Langford had to "show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." Hill, 474 U.S. at 59, 106 S.Ct. at 370. Langford utterly fails to meet this requirement. Indeed, the record strongly supports the determination of the state courts and the district court that, even if Langford had been advised as his present counsel now urges, and even if he had been offered a defense psychiatrist, he would have pleaded guilty anyway. Once it was clear that MacKay could not guarantee that Langford would not spend a long time in prison, Langford was determined and unequivocal in his decision to plead guilty and seek the death penalty. Unlike decisions about trial strategies, the decision to plead guilty was Langford's to make, and Montana's Rules of Professional Conduct bound MacKay to that decision. See Montana Rules of Professional Conduct, 1.2(a) ("[T]he lawyer shall abide by the client's decision, after consultation with the lawyer, as to a plea to be entered....").
 
 
 37
 We conclude, therefore, that Langford was not denied effective assistance of counsel in his plea proceeding. The state trial court consequently did not violate Langford's constitutional rights in refusing to permit him to withdraw the plea.
 
 
 38
 2. The District Court's Application of the Presumption of Correctness to the State Courts' Findings of Fact
 
 
 39
 Langford contends that the district court's analysis, which we have just accepted, is fatally flawed because the district court improperly accorded a presumption of correctness to several of the state courts' fact findings. A state court's factual findings generally are entitled to a presumption of correctness under 28 U.S.C. § 2254(d).[3] See Melugin v. Hames, 38 F.3d 1478, 1482 (9th Cir.1994). Langford argues, however, that the district court should not have accorded the presumption of correctness to various findings because one or more of the following exceptions to § 2254 apply: (1) the merits of the factual disputes were not resolved, (2) Langford was denied due process in the state proceedings, and (3) the factual findings are "not fairly supported" by the record of the state court proceedings. See 28 U.S.C. § 2254(d)(1),(7),(8). We address the due process claim first, and then deal with Langford's other challenges to the state factual findings as they arise in connection with particular findings of fact.
 
 
 40
 a. Due Process in the Denial of the Motion to Withdraw Plea
 
 
 41
 Langford argues that he was denied due process because the state trial court applied the wrong legal standard when it decided his motion to withdraw his guilty pleas.[4] Because the mandatory direct appeal was not yet resolved and the judgment was still "open," Langford argues, he was only required to assert and prove by affidavit or oral testimony that "good cause" existed to allow withdrawal of the guilty pleas. See Mont.Code Ann. § 46-16-105 (stating that "[a]t any time before or after judgment the court may, for good cause shown, permit the plea of guilty to be withdrawn and a plea of not guilty substituted"); State v. McAllister, 96 Mont. 348, 30 P.2d 821, 823 (1934) (holding that change of plea ordinarily permitted if defendant was "in ignorance of his rights and of the consequences of his act, or if influenced unduly and improperly either by hope or by fear in making it, or if it appears that the plea was entered under some mistake or misapprehension"). Further, the Montana Supreme Court has held that if a defendant is not aware of a potentially meritorious defense, then it is reversible error to accept a guilty plea. State v. Lance, 201 Mont. 30, 651 P.2d 1003, 1005 (1982) (holding that the trial court committed error by accepting guilty plea of defendant who had not been informed of possible defense; defendant did not file motion to withdraw guilty plea until three years after making plea).
 
 
 42
 Langford may not, however, transform a state-law issue into a federal one merely by asserting a violation of due process. We accept a state court's interpretation of state law, see Melugin, 38 F.3d at 1482, and alleged errors in the application of state law are not cognizable in federal habeas corpus. Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir.1985), cert. denied, 478 U.S. 1021, 106 S.Ct. 3336, 92 L.Ed.2d 741 (1986). Our concern is with Langford's federal rights.
 
 
 43
 The state trial court applied the proper test under the Sixth Amendment. It invoked Hill and Strickland and ruled that Langford "would not have entered a not guilty plea even if his trial counsel would have advised him concerning the suppression, psychiatric and constitutionality issues as his appellate counsel now suggests." The state trial court held that it could not determine whether counsel's performance "fell below any objective standard of reasonableness," but because Langford failed to prove prejudice, that determination was unnecessary. The trial court properly applied the federal standard.
 
 
 44
 Langford was not unfairly surprised by application of the Hill standard. In his memorandum in support of his motion to withdraw his plea, Langford argued both the Hill test and the state-law standard.
 
 
 45
 Langford contends that he was unfairly surprised because the Montana Supreme Court, in addition to applying Hill, went beyond the ruling of the state trial court and held that MacKay's performance was not deficient. Langford I, 813 P.2d at 946-48. The Montana Supreme Court ruled that Langford's challenge to his confession would not have been viable because a bare refusal to waive Miranda rights is not the equivalent of a request for counsel.[5] Id. at 946-47. Langford asserts that, if he had known that the Montana Supreme Court would address the merits of his potential challenge to his confession, he would have expanded the record in the state trial court to meet that challenge.
 
 
 46
 We find Langford's contention unpersuasive. In his motion to withdraw his guilty plea, Langford devoted several pages to the merits of his potential challenge to his confession. He provided an affidavit in which he described the circumstances surrounding his arrest. Langford had the opportunity to make his record in the state trial court. Contrary to his argument, he was not required to prove that his potential defense would have succeeded; he was required only to show that, had he been properly advised, he would not have pleaded guilty.
 
 
 47
 We conclude, therefore, that the state court proceedings did not deny Langford due process of law. His attack on the state-court factual findings on due process grounds accordingly fails. We turn, then, to Langford's other challenges to those findings.
 
 
 48
 b. Challenges to Fact Findings as Not Resolved or Not Fairly Supported by the Record
 
 
 49
 i. Factual Findings Regarding MacKay's Failure to Advise Langford of Potentially Meritorious Pretrial Arguments
 
 
 50
 The federal district court listed eight facts determined by the Montana Supreme Court to which the district court found the presumption of correctness applied. Langford's challenges to some of these findings do not really dispute the facts; they simply offer interpretations or explanations of them. Langford, for example, does not disagree with the finding that he did not tell MacKay that he had initially refused to waive his Miranda rights. He simply contends that he was unaware that his refusal might be significant. Similarly, he agrees that he discussed the circumstances of his arrest with MacKay, but asserts that the findings of the state trial and supreme court were inconsistent as to when the discussion occurred, and inconsistent with MacKay's testimony that he did not recall having seen the Miranda form marked "refused to sign." Langford also contests the finding that MacKay investigated the facts and discussed legal options and strategies with Langford, but his challenge really amounts to a contention that MacKay should have done more, and that his failure to investigate preceded Langford's decision to plead guilty and seek the death penalty. Langford does not contradict the fact that MacKay did investigate and discuss options. Langford's challenges do nothing to cast doubt on these factual findings of the state courts.
 
 
 51
 Langford also disputes that his state of mind was such that he would have pleaded guilty even if he had been properly advised. This is not one of the eight factual findings listed by the federal district court. It is not an evidentiary "fact," but rather is a legal conclusion drawn from factual findings about Langford's state of mind. The federal district court did rely on two factual findings regarding Langford's state of mind during the period preceding his plea, which Langford does not contest. These findings are that "Langford repeatedly instructed counsel not to file any suppression motion or initiate any further investigation on his behalf because he wanted to plead guilty and seek the death penalty," and that "Langford told counsel that unless he could guarantee his acquittal on the charges pending against him or could assure him that he would spend little time in prison, he wanted to plead guilty and be executed." Langford does not dispute that he gave these instructions; these findings are entitled to the presumption of correctness.
 
 
 52
 ii. Factual Findings Relevant to Claim that MacKay Mismanaged the Psychiatric Evaluation Process
 
 
 53
 The federal district court relied on thirteen findings of fact by the state courts on MacKay's handling of psychiatric matters. In addition, the federal district court conducted its own evidentiary hearing on whether MacKay informed Langford of his right to remain silent during the psychiatric evaluation. Langford disputes several factual findings by the state courts.
 
 The state trial court found the following:
 
 54
 1. Nobody has ever contended that Langford was not competent and in complete control of all of his mental faculties either at the time of the commission of the offense or at any other time.
 
 
 55
 2. Langford, MacKay and the psychiatric evaluation point to Langford's complete mental competence.
 
 
 56
 3. Langford's actions in court were appropriate. Langford was clearly able to communicate with MacKay and understood the proceedings.
 
 
 57
 Langford v. Day, No. CV-91-51-H-CCL, Opinion and Order at 15, (D.Montana, Jan. 24, 1995) (citations omitted). The state supreme court found that the record was "void of evidence that Langford displayed any bizarre behavior or made any remarks that indicated a need for further evaluation." Langford I, 813 P.2d at 948.
 
 
 58
 Langford disagrees with the conclusion that he was competent to plead guilty. We conclude, however, that these findings are entitled to the presumption of correctness. The psychiatrists at the state hospital evaluated Langford's mental health and concluded that he was not suffering from any mental illness. There was nothing about Langford's behavior that indicated he was not competent, unless one concludes that pleading guilty and asking for the death penalty is not a sane choice, and we decline to draw such a conclusion. The state courts' finding that Langford was competent is supported by the record.
 
 
 59
 The second factual issue that Langford disputes is that he pleaded guilty because he did not want to spend a lot of time in prison. Langford does not dispute, however, that this is what he said to MacKay. Therefore, this finding is entitled to the presumption of correctness.
 
 
 60
 The third factual finding that Langford disputes is that he did not put his mental state at issue. The state supreme court found that Langford did not put at issue his mental state as it existed at the time of the commission of the crimes, after he was arrested, at the time he entered his guilty pleas, or at the sentencing hearing. Langford argues that the fact that he was subjected to a psychiatric evaluation means that he put his mental state at issue. Langford does not dispute, however, that he raised no issue of competence at any point in his judicial proceedings. This factual finding is entitled to the presumption of correctness.
 
 
 61
 Finally, Langford disputes the finding that there was no showing that appointment of a defense psychiatrist was warranted. Langford emphasizes that MacKay testified that he was unaware of the Ake decision. See Ake, 470 U.S. at 83, 105 S.Ct. at 1096. As we have just pointed out, however, the record supports the finding that there were no facts suggesting that Langford's mental state would be an issue.
 
 
 62
 We conclude, therefore, that there is no merit to any of Langford's arguments that the presumption of correctness should not be applied to the state courts' findings. We turn, therefore, to Langford's challenges to his sentence.
 
 B. The Sentence of Death
 
 63
 Langford presents three arguments in attacking the validity of his death sentence. First, he contends that the sentencing court failed properly to consider and weigh mitigating circumstances. Second, he asserts that the Montana death penalty violates the Montana constitution and that, in refusing to recognize the precedent establishing this point, the Montana Supreme Court denied him due process and equal protection of the laws. Third, Langford contends that his method of execution, hanging, is cruel and unusual punishment in violation of the Eighth Amendment. We address these arguments in order.
 
 
 64
 1. The Montana State Court's Consideration of Mitigating Evidence
 
 
 65
 As with his guilty plea, Langford's own conduct overhangs the issue of the state courts' consideration of mitigating evidence. Langford instructed MacKay to offer no evidence of mitigation, and to convey to the court Langford's desire for the death penalty. Langford confirmed his position in his own testimony. Of course, Langford's wishes alone cannot support or justify his death penalty; his sentence must be in accordance with constitutionally sufficient standards of state law. We conclude that it is.
 
 
 66
 Langford argues that his death sentences violate the Sixth, Eighth, and Fourteenth Amendments because the Montana state courts failed to consider, weigh, and give effect to certain mitigating evidence. He points to the following evidence contained in the presentence or hospital report: (1) Langford admitted to having used marijuana daily and LSD every other day (but not at the time of the murders); (2) Langford had a troubled family life and suffered abuse as a child; (3) Langford lived in a children's correctional facility between the ages of 10 and 12, and then with his grandparents until age 18; (4) Langford put himself in the worst possible light by, for example, saying that he received poor grades in school when his grades actually were above average; (5) Langford's parents were cold and indifferent toward him when questioned by the probation officer; (6) Langford may have requested the death penalty as retribution against his parents; and (7) Langford had suicidal tendencies. He asserts that the sentencing court not only failed to consider these factors as mitigating, it made no written findings discussing their effect.
 
 
 67
 Langford relies heavily on Smith v. McCormick, 914 F.2d 1153, 1169 (9th Cir.1990). In that case, we reversed a Montana death penalty, in part because of inadequate consideration of mitigating evidence. We found several constitutional errors in Montana's procedures for assessing mitigating evidence. First, we held that Montana misused the standard that no mitigating circumstance was "sufficiently substantial" to call for leniency. Id. at 1164. With regard to unenumerated factors, "[t]he term 'sufficiently substantial' was used not to describe the process of weighing mitigating factors, but rather as a qualifier which excluded from consideration as a mitigating factor evidence which 'did not excuse the defendant's conduct.' " Id. (quoting McKoy v. North Carolina, 494 U.S. 433, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990)). Second, we held in Smith that the Montana courts had improperly analyzed each mitigating factor separately to determine whether it rose to the level to call for leniency, rather than considering all mitigating circumstances together to see whether they warrant a sentence less than death. Smith, 914 F.2d at 1168. We noted that the Montana Supreme Court had used the singular in stating that " 'no mitigating circumstance was sufficiently substantial to call for leniency.' " Id. Finally, we held that the Montana courts had not made adequate written findings regarding mitigating factors, as required by state statute. Id. at 1166. "The sentencing court must ... discuss in its written findings all relevant mitigating circumstances, 'including those it finds insufficient to warrant leniency.' " Id.
 
 
 68
 Langford contends that Smith clearly dictates the reversal of his death sentence. Langford points out that the sentencing court did not consider explicitly the unenumerated factors set forth above. Most important, the sentencing court and the Montana Supreme Court both used the phrase "sufficiently substantial to call for leniency" in stating that there were no such mitigating circumstances. Both courts did, however, use the plural when stating that no such mitigating circumstances exist. See Langford I, 813 P.2d at 949-50.
 
 
 69
 We conclude, however, that in the circumstances of Langford's sentencing proceeding, the Montana courts were not required to evaluate and discuss less-than-substantial unenumerated mitigating circumstances that might exist but had not been offered or referred to by Langford or his counsel. Langford insisted that no mitigating circumstances be offered; his counsel even objected to preparation of the presentence report that is the source of all but one of the factors now urged. We conclude that, when the defendant and his counsel ask the court to find no mitigation, the Eighth Amendment does not require the sentencing court to search the record in order to evaluate and discuss specifically less-than-substantial unenumerated mitigating factors neither offered nor pointed out as mitigating at the time of sentencing.
 
 
 70
 The sentencing court in its written findings of fact did evaluate and discuss the enumerated mitigating factors set out in the Montana statutes. It found that all but one of these factors simply did not exist at all. The Montana Supreme Court made the same finding. Langford I, 813 P.2d at 950. Langford does not dispute these findings. The only enumerated factor that the sentencing court found to be present in any degree was the absence of an extensive criminal record.
 
 
 71
 The trial court's discussion of that factor indicates clearly that it did not use the "sufficiently substantial to call for leniency" factor as a means of entirely avoiding consideration of the factor if it failed to reach a given level. The trial court stated:
 
 
 72
 Although the Defendant does not have an extensive documented prior record, at the time of the commission of this offense, Defendant was on probation from Raleigh, North Carolina, for the felony crimes of forgery and tampering with a vehicle. Defendant was in violation of this probation at the time of the commission of the instant offenses. The brutality of these homicides, coupled with Defendant's own statements that he had intended to kill a pizza delivery boy and a hotel maid in order to aid his flight back to Raleigh, North Carolina, dictate that Defendant not be given any leniency for his lack of an extensive prior criminal record.
 
 
 73
 State v. Langford, No. DC-88-30, Findings of Fact, Conclusions of Law, Judgment and Sentencing, at 4 (D. Montana, Jan 1, 1989) (citations omitted). It is apparent from this discussion that the sentencing court was not disregarding entirely Langford's lack of an extensive criminal record; instead, it weighed that factor against the aggravating factors and found no reason for leniency. The sentencing court did not employ the standard "sufficiently substantial to call for leniency," which it recited elsewhere in its findings, as a device for disregarding the one existing enumerated factor entirely if it failed to reach a certain level of magnitude. We find no Smith error here.
 
 
 74
 We also cannot fault the state trial court or Montana Supreme Court for not considering the mitigating evidence cumulatively. The only enumerated factor found in any degree at all was the absence of an extensive criminal record. Because we conclude that the state courts were not required to search the record for less-than-substantial unenumerated factors not offered or referred to by Langford or his counsel, there were no other factors to cumulate. We therefore reject Langford's challenge to the Montana courts' evaluation of mitigating factors.2. The Constitutionality of the Montana Death Penalty Statutes
 
 
 75
 Langford argues that the Montana Supreme Court denied him due process and equal protection under the United States Constitution because that court failed to declare the Montana death penalty statutes unconstitutional as a matter of state law. In Langford I, 813 P.2d at 952, and Langford II, 819 P.2d at 151, the Montana Supreme Court held that the Montana death penalty statutes did not violate the state constitution. That ruling raises no federal issue for our consideration. See Melugin, 38 F.3d at 1482; Middleton, 768 F.2d at 1085.
 
 
 76
 Langford attempts, however, to federalize his claim by arguing that the Montana Supreme Court violated his rights to due process and equal protection by denying him the benefit of a previous state decision, State ex rel. Cashmore v. Anderson, 160 Mont. 175, 500 P.2d 921, 930 (1972) (finding that majority of electors voting at election approved Montana Constitution), cert. denied, 410 U.S. 931, 93 S.Ct. 1372, 35 L.Ed.2d 593 (1973). Langford raised those federal claims only in his second postconviction petition. The Montana Supreme Court held that the claims were defaulted, because he had failed to raise them by petition for rehearing after the decision in Langford I.
 
 
 77
 We conclude that these claims are procedurally barred because Langford failed to assert them in timely fashion in the state courts. We cannot review the claims because Langford does not allege or show cause and prejudice for his procedural default. See McCleskey v. Zant, 499 U.S. 467, 493, 111 S.Ct. 1454, 1469-70, 113 L.Ed.2d 517 (1991).
 
 
 78
 3. The Constitutionality of Hanging as a Method of Execution
 
 
 79
 Finally, Langford argues that execution by hanging is cruel and unusual punishment in violation of the Eighth Amendment. This argument is foreclosed by our en banc decision in Campbell v. Wood, 18 F.3d 662, 681-85 (9th Cir.), cert. denied, 511 U.S. 1119, 114 S.Ct. 2125, 128 L.Ed.2d 682 (1994). There, we held that hanging as a method of execution does not involve the "unnecessary and wanton infliction of pain," and accordingly does not violate the Eighth Amendment. Id. at 683.
 
 III. CONCLUSION
 
 80
 The district court's denial of Langford's petition for habeas corpus and grant of summary judgment for respondents is
 
 
 81
 AFFIRMED.
 
 
 
 [1]
 In an affidavit in support of his motion to withdraw his guilty plea, Langford stated that he thought he used the word "lawyer" at some point in refusing to waive his rights, but that he wasn't "exactly sure" that he did
 
 
 [2]
 After this appeal had been briefed, argued and submitted for decision, Congress enacted the Anti-Terrorism and Effective Death Penalty Act of 1996. We assume for purposes of decision that the Act's requirement of a certificate of appealability does not apply retroactively to Langford's case, and that the district court's certificate of probable cause is sufficient to permit him to maintain his appeal. See Williams v. Calderon, 83 F.3d 281, 286 (9th Cir.1996) (assuming without deciding that requirement of certificate of appealability did not apply to pending request for certificate of probable cause, and granting certificate of probable cause). We need not decide whether the Act's stricter review provisions of section 2254 apply, because we conclude that Langford cannot succeed under the more lenient pre-Act standards. The separate death penalty provisions of Chapter 154 of the Act, which are expressly made applicable to pending appeals, do not apply by their own terms because Montana has not established of record its qualification under the Act's section 2261
 
 
 [3]
 For reasons stated in note 3, supra, we apply section 2254 as it existed prior to the amendments incorporated in the Antiterrorism and Effective Death Penalty Act of 1996
 
 
 [4]
 Langford presents this due process argument only as an attack on the presumption of correctness of state court factual findings
 
 
 [5]
 The Supreme Court also relied on the facts that Langford had not told MacKay of his initial refusal to waive his rights and that Langford insisted on pleading guilty and requesting the death penalty. Langford I, 813 P.2d at 947