BETTY B. FLETCHER, Circuit Judge,
dissenting:
Smith is set to be executed by the State of Montana because, at his arraignment twenty-seven years ago, he pleaded guilty and requested the death penalty. Had he instead accepted the plea bargain offered by the Flathead County Attorney, he might well be a free man today.[1] Because there is a reasonable probability that Smith would have made a different decision had he been provided with effective counsel, I respectfully dissent.
I. There is a Reasonable Probability that, Had He Been Provided with Effective Assistance, Smith Would Have Gone to Trial
Guilty pleas must be knowing and voluntary. See Puckett v. United States, - U.S. -, -, 129 S.Ct. 1423, 1429, 173 L.Ed.2d 266 (2009). Smith’s fateful decision to plead guilty and seek the death penalty was neither. At the time of the arraignment, he was deeply depressed because he had been in solitary confinement for some time and subjected to harsh living conditions. He had received death threats from Native American inmates and believed that he would be killed in prison. Most importantly, his attorney was manifestly ineffective. See Hill v. Lockhart, 474 U.S. 52, 56, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985) (“[T]he voluntariness of [a] plea depends on whether counsel’s advice ‘was within the range of competence demanded of attorneys in criminal cases.’ ”) (quoting McMann v. Richardson, 397 U.S. 759, 771, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970)). Smith’s guilty plea should not have been accepted by the Montana district court.
A. The Correct Question is Whether Smith Would Have Gone to Trial, Not Whether a Jury Would Have Found Him Not Guilty
The majority concludes that the assistance provided by Smith’s attorney, Doran, “fell below an objective standard of reasonableness.” Strickland v. Washington, 466 U.S. 668, 688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). But they excuse Doran’s many failures because they find that Smith was *1000 not prejudiced. Id. at 692, 104 S.Ct. 2052 (“[A]ny deficiencies in counsel’s performance must be prejudicial to the defense in order to constitute ineffective assistance under the Constitution.”). That holding is apparently based on their view that it is not “likely” that any of the affirmative defenses that Smith could have raised at trial would have been successful. See Maj. Op. at 988-89. By focusing on Smith’s defenses, the majority implicitly finds no prejudice because, had he gone to trial, a jury would have found him guilty.
But Smith need not prove so much. Prejudice in this case is not measured by the possibility of a not-guilty outcome, but rather the possibility that he would not have sacrificed his constitutional right to a trial. When a petitioner claims ineffective assistance during the plea bargaining process, he “must show that there is a reasonable probability that, but for counsel’s errors, he would not have pleaded guilty and would have insisted on going to trial.” Hill v. Lockhart, 474 U.S. 52, 59, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985). A reasonable probability is “a probability sufficient to undermine confidence in the outcome,” Strickland, 466 U.S. at 694, 104 S.Ct. 2052, but “less than the preponderance more-likely-than-not standard,” Summerlin v. Schriro, 427 F.3d 623, 643 (9th Cir.2005) (en banc). See also Strickland, 466 U.S. at 693, 104 S.Ct. 2052 (“[A] defendant need not show that counsel’s deficient conduct more likely than not altered the outcome in the case.”). The question is not whether an affirmative defense would likely have succeeded at trial, but rather whether we can be confident that Smith would still have plead guilty had he known that he could have raised an affirmative defense at trial.
When deciding what probability is “reasonable,” we must keep in mind that this is a capital case. Because of the high stakes involved, our confidence is more easily shaken by unreasonable errors by trial counsel. Cf. Cox v. Ayers, 588 F.3d 1038 (9th Cir.2009) (“The bar for establishing prejudice is set lower in death-penalty sentencing cases than in guilt-phase challenges and noncapital cases.”). As the Supreme Court explained in Woodson v. North Carolina, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976),
the penalty of death is qualitatively different from a sentence of imprisonment, however long. Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case.
Id. at 305, 96 S.Ct. 2978; see also Lockett v. Ohio, 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (plurality opinion) (requiring a “greater degree of reliability when the death sentence is imposed”).[2]
*1001 B. There is a Reasonable Probability that, Had Smith Known About Colorable Defenses, He Would Have Gone to Trial

i. Ineffective Assistance

Doran provided Smith with pitifully little assistance.[3] The greater the departure from the standard of “reasonably effective assistance,” Strickland, 466 U.S. at 688, 104 S.Ct. 2052, the greater our suspicion that the defendant was prejudiced by that departure. At the extreme end, when a lawyer effectively abandons the defendant during a critical stage of the proceedings, his or her ineffective assistance amounts to constructive denial of the defendant’s right to counsel and prejudice is presumed. See Roe v. Flores-Ortega, 528 U.S. 470, 482, 120 S.Ct. 1029, 145 L.Ed.2d 985 (2000) (noting that there are situations in which, based on the “magnitude of the deprivation of the right to effective assistance of counsel,” prejudice can be presumed); Vansickel v. White, 166 F.3d 953, 962 (9th Cir.1999). We assume prejudice because, “if counsel entirely fails to subject the prosecution’s case to meaningful adversarial testing,” the entire process is unreliable. United States v. Cronic, 466 U.S. 648, 659, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984),[4] While it is not fair to say that Doran did absolutely nothing prior to Smith pleading guilty, it is fair to say that he “entirely fail[ed] to subject the prosecution’s case to meaningful adversarial testing,” Id. at 659, 104 S.Ct. 2039. His time records show that, prior to Smith’s plea, he spent “0” hours on investigation and 6.3 hours on research. He received a list of 35 potential witnesses from the state. He interviewed only four or five of them, preferring instead to rely on state prosecuting attorney Ted Lumpus for information about how the witnesses would testify. See Hamilton v. Ayers, 583 F.3d 1100, 1114 (9th Cir.2009) (finding ineffective assistance where the defense “investigation consisted of at most five interviews”). He did not hire an investigator or visit the scene of the crime himself, figuring the facts at issue.were not “particularly complicated” and trusting Smith’s account of the crime. Cf. Powell v. Ala., 287 U.S. 45, 58, 53 S.Ct. 55, 77 L.Ed. 158 (1932) (presuming prejudice where “[n]o attempt was made to investigate.”).
Doran also did nothing to explore possible affirmative defenses. He had conversations with Smith about his background, where he learned about Smith’s psychological problems and drug use. But he never sought Smith’s mental health, educational, or corrective records. See Porter v. McCollum, — U.S. -, 130 S.Ct. 447, 175 L.Ed.2d 398 (2009) (per curiam) (holding that counsel was deficient for failing to obtain any school, medical, or military records, or otherwise to investigate the defendant’s mental health and background). Though Smith’s “hope for his own execution should have raised alarms,” Burt v. Uchtman, 422 F.3d 557, 568 (7th Cir.2005), Doran never asked for a psychiatric evaluation. By his own admission, Doran did not discuss any viable affirmative defenses with Smith.
*1002 Furthermore, Doran knew that Smith wanted to die because he was suffering from deep depression caused by living in solitary confinement, where he was denied fresh air, sunlight, and exercise. Doran also knew that Smith had received “numerous death threats” from Native American inmates and that he believed it was better to be executed than killed in prison. While these pressures perhaps did not render Smith incompetent, they clearly did impair his “ability to make adequately considered decisions in connection with [his] representation.” Model Rules of Professional Conduct Rule 1.14 (1983). When a client “cannot adequately act in [his] own interest,” his lawyer is obligated to take “protective action.” Id.; see also Model Code of Professional Responsibility EC 7-12 (1980). At a minimum, Doran should have requested that Smith be moved to a different cell, asked prison guards to take measures to prevent Smith from being attacked by other inmates, and assured Smith that he would be protected. It was Doran’s responsibility to ensure that Smith’s decision to plead guilty and seek death was based on a clear understanding of the evidence against him and possible defenses. Instead, Smith’s guilty plea was the product of fear and abject despair.
The record clearly demonstrates that, once Smith told Doran that he wanted to plead guilty and seek the death penalty, Doran gave up on him. Although his ineffective assistance was not absolutely “complete,” and perhaps does not warrant a presumption of prejudice, Bell v. Cone, 535 U.S. 685, 697, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002), it came extremely close.

ii. Prejudice

Notwithstanding Doran’s alarmingly poor performance, the majority finds no prejudice to Smith because they believe that it is unlikely that a voluntary intoxication or mitigated homicide defense would have succeeded at trial. See Hill v. Lockhart, 474 U.S. 52, 59, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985) (identifying the probable success of potential affirmative defenses as one factor in the prejudice inquiry). There was evidence that Smith had been drinking heavily the day of the murders and using large quantities of LSD around that time, which was relevant to the question of whether Smith “purposely or knowingly” committed the murders. Mont. Code Ann. § 45-5-102 (deliberate homicide); Mont.Code Ann. § 45-2-203 (1985) (voluntary intoxication). There was also evidence to support a mitigated homicide defense, as Smith was emotionally disturbed at the time of the crimes. Mont.Code Ann. § 45-5-103.
To support their conclusion that these defenses would have been unsuccessful, the majority points to Smith’s first plea hearing, where he testified that he was “of a cold and calculating mind” when he killed Running Rabbit and Mad Man, and also told the judge that he “had a kind of morbid fascination to find out what it would be like to kill somebody.” See Maj. Op. at 990, 991. He gave this testimony in response to the sentencing judge’s question of why he thought he deserved the death penalty. Had Doran properly advised Smith, Smith would have pleaded not guilty and would have remained silent at the plea hearing. See, e.g., Moore v. Czerniak, 574 F.3d 1092, 1109-1114 (9th Cir.2009) (gauging prejudice by considering the evidence the state would have offered had defense counsel not erred by failing to block introduction of defendant’s illegally obtained confession); Strickland v. Washington, 466 U.S. 668, 689, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) (“A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight....”). Smith’s incriminating testimony was the direct result of his attorney’s errors; that *1003 testimony cannot be used to prove what would have happened absent those errors.[5]
No one can know for certain whether Doran could have persuaded a jury on either a mitigated homicide or voluntary intoxication theory, but we do know that he could have marshaled enough evidence that the jury would have had to consider those defenses. See State v. Gone, 179 Mont. 271, 587 P.2d 1291 (1978) (voluntary intoxication defense put to a jury despite overwhelming evidence showing intent); State v. Buckley, 171 Mont. 238, 557 P.2d 283, 285 (1976) (mitigated homicide defense must be put to a jury if there is any evidence of extreme mental or emotional stress). Because Smith had colorable defenses to deliberate homicide, he would have been entitled to jury instructions on those defenses.
Even were we to assume that it is unlikely that a jury would have been persuaded by a voluntary intoxication or mitigated homicide theory, there would still be a reasonable probability that Smith would have gone to trial had he known about them. This is not a case, like Hill, where the defendant risked forfeiting a favorable plea agreement by going to trial. Smith had nothing to lose. He could plead guilty to deliberate homicide and possibly be sentenced to death. Or he could plead not guilty and possibly be sentenced to death — or perhaps be found ineligible for the death penalty, if the jury decided he was guilty of the lesser crime of mitigated deliberate homicide on account of intoxication or emotional stress. The benefits of going to trial must be weighed against the costs, and here there were none. The majority loses sight of this fact because they focus on the question of whether Smith would have been found not guilty, instead of whether he would have gone to trial.
Smith should have pleaded not guilty if there was any chance a voluntary intoxication or mitigated deliberate homicide defense would have succeeded, and we cannot say for sure that those defenses were futile. Cf. Roe v. Flores-Ortega, 528 U.S. 470, 485, 120 S.Ct. 1029, 145 L.Ed.2d 985 (2000) (holding that “evidence that there were nonfrivolous grounds for appeal ... will often be highly relevant” in determining whether appellant was prejudiced by counsel’s failure to file a notice of appeal). Therefore, there is a reasonable probability that Smith would have insisted on going to trial had Doran advised him adequately.
C. Smith’s Hope for the Death Penalty Should Not be Decisive
“The fact that overshadows this case” is that Smith told the sentencing judge that he wanted to be executed. Langford v. Day, 110 F.3d 1380, 1386 (9th Cir.1997). In Langford, we held that, where a defendant was “determined and unequivocal in his decision to plead guilty and seek the death penalty,” he could not have been prejudiced by his counsel’s failure to adequately assist him during plea proceedings. Id. at 1388.[6] Langford truly was *1004 adamant that he be executed. He persisted in that decision through two months of psychiatric evaluation at a hospital; followed by two more months of frequent meetings with his attorney, who tried to change his mind; through sentencing, where he did not present any mitigating evidence; and even after he was sentenced to death, when he chose not to appeal. Id. at 1383-84.
By contrast, Smith was not nearly so persistent in his death wish. He pleaded guilty on February 24, 1983, and was sentenced to death on March 21, 1983. He changed his mind “shortly thereafter” and submitted a motion for re-sentencing on April 11, 1983. It took less than three weeks for him to decide that he did not want to die, which strongly suggests that he was not so resolute as Doran claimed to believe. At the re-sentencing hearings on May 3, 1983, and December 1, 1983, Smith testified that he had changed his mind because he had been transferred to better prison conditions — a transfer that Doran should have sought before Smith plead guilty. See supra at 1003-04. Accordingly, we cannot be as confident as the court in Langford that Smith would not have changed his mind and decided to proceed to trial had Doran provided adequate assistance.[7]
Smith’s decision to plead guilty and seek the death penalty was itself a symptom of Doran’s ineffective assistance. See Comer v. Schriro, 480 F.3d 960, 966 (9th Cir.2007) (en banc) (Paez, J., concurring) (emphasizing that panel was allowing capital defendant to voluntarily dismiss his appeal because defendant had been fully advised as to the viability of his legal claims); McMann v. Richardson, 397 U.S. 759, 767, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970) (suggesting that counsel’s ineffectiveness during plea proceedings is not prejudicial where “defendant has his own reasons for pleading guilty wholly aside from the strength of the case against him”) (emphasis added). While that decision perhaps should be given a measure of deference, Summerlin v. Stewart, 267 F.3d 926 (9th Cir.2001), that decision should not be decisive because it was not knowing and intelligent, Jeffries v. Blodgett, 5 F.3d 1180, 1198 (9th Cir.1993).
It is hard to escape the fact that we would not be here if Smith had not succumbed to his semi-suicidal thoughts and instead had accepted the plea bargain offered by the Flathead County Attorney, which would have required him to plead guilty in exchange for a 110 year sentence. That decision — and the twenty-seven years of litigation it triggered — was the product of Doran’s inadequate assistance. I would find prejudice.
II. The Court Should Hear and Grant Smith’s Lackey Claim
The majority holds that Teague v. Lane, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), prevents us from recognizing a new Eighth Amendment claim for prisoners who have spent a very long time on death row. The Supreme Court in Teague did bar courts from announcing new rules of constitutional law on habeas review, 489 U.S. at 316, 109 S.Ct. 1060, but it also provided for two exceptions. Teague does not apply where the new rule is one that (1) “places certain kinds of primary, pri *1005 vate individual conduct beyond the power of the criminal law-making authority to proscribe” or (2) “requires the observance of those procedures that ... are implicit in the concept of ordered liberty.” Id. at 307, 109 S.Ct. 1060.
The first exception clearly applies here. See Penry v. Lynaugh, 492 U.S. 302, 330, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), aff'd and rev’d on other grounds, 532 U.S. 782, 121 S.Ct. 1910, 150 L.Ed.2d 9 (2001). The Supreme Court in Penry explained why Teague did not prevent it from holding that the Eighth Amendment prohibits the execution of mentally retarded persons:
In our view, a new rule placing a certain class of individuals beyond the State’s power to punish by death is analogous to a new rule placing certain conduct beyond the State’s power to punish at all. In both cases, the Constitution itself deprives the State of the power to impose a certain penalty.... Therefore, the first exception set forth in Teague should be understood to cover not only rules forbidding criminal punishment of certain primary conduct but also rules prohibiting a certain category of punishment for a class of defendants because of their status or offense.
Id. at 329-30, 109 S.Ct. 2934. Cf. Ford v. Wainwright, 477 U.S. 399, 409-10, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986) (declaring a defendant who had become insane since his conviction ineligible for the death penalty on Eighth Amendment grounds). By the same logic, Teague does not prevent this court from holding that execution after a long tenure on death row violates the Eighth Amendment. The court may reach the merits of Smith’s Lackey claim.
We have always found a way to avoid addressing Lackey claims on the merits, usually by invoking AEDPA’s bar against second or successive petitions. See, e.g., Allen v. Omoski, 435 F.3d 946, 948 (9th Cir.2006); LaGrand v. Stewart, 170 F.3d 1158, 1160 (9th Cir.1999); Gerlaugh v. Stewart, 167 F.3d 1222, 1223 (9th Cir.1999); Ortiz v. Stewart, 149 F.3d 923, 944 (9th Cir.1998); but see McKenzie v. Day, 57 F.3d 1461,1467 (9th Cir.1995) (declining to stay execution because it was “highly unlikely that McKenzie’s Lackey claim would be successful if litigated to its conclusion.”). AEDPA does not apply here, see Maj. Op. at 986, and neither does Teague. We are out of excuses.
There is a strong case to be made that long stays on death row violate the Eighth Amendment.[8] As I explained more fully in my dissent to the denial of the stay in Ceja v. Stewart, 134 F.3d 1368 (9th Cir.1998), the Supreme Court has made clear that “the imposition of the death penalty must serve legitimate and substantial penological goals in order to survive Eighth Amendment scrutiny,” and it must serve those goals more effectively than a less severe punishment. Id. at 1370 (B. Fletcher, J., dissenting) (citing Gregg v. Georgia, 428 U.S. 153, 183, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976)). Specifically, a capital sentence may be imposed when it is *1006 the only way to express “society’s moral outrage at particularly offensive conduct” and functions as an effective deterrent. Id. Where the death penalty
ceases realistically to further these purposes ... its imposition would then be the pointless and needless extinction of life with only marginal contributions to any discernible social or public purpose. A penalty with such negligible returns to the State would be patently excessive and cruel and unusual punishment violative of the Eighth Amendment.
Furman v. Georgia, 408 U.S. 238, 312, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) (White, J., concurring).
Smith has suffered 27 years on death row, living in solitary confinement and under the constant threat of execution. See Furman v. Georgia, 408 U.S. 238, 288, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) (Brennan, J., concurring) (“[T]he prospect of pending execution exacts a frightful toll during the inevitable long wait between the imposition of sentence and the actual infliction of death.”); In re Medley, 134 U.S. 160, 172, 10 S.Ct. 384, 33 L.Ed. 835 (1890) (waiting for an execution without knowing when it is to take place is “one of the most horrible feelings to which [a person] can be subjected”). Executing Smith after all this time would go far beyond what is necessary to satisfy society’s moral outrage over his horrible crimes. It is hard to see how Smith’s execution today would have any deterrent effect. See Furman, 408 U.S. at 302, 92 S.Ct. 2726 (Brennan, J., concurring) (“[The] validity[of the death penalty] depends upon the existence of a system in which the punishment of death is invariably and swiftly imposed.”). Executing Smith would not advance the purposes underlying the death penalty, and thus would violate the Eighth Amendment.
Because I would find that Smith has proven ineffective assistance of counsel and a Lackey violation, I would grant the petition for habeas corpus.

. This is not simply speculation. Under the proffered plea agreement, the prosecutor would have recommended a 110 year sentence if Smith pleaded guilty to two counts of deliberate homicide. Smith would have been eligible for parole after 17 and a half years. See Maj. Op. at 982-83. Smith's co-defendant, Rodney Munro, accepted a similar agreement: he pleaded guilty to two counts of aggravated kidnaping — which was also a capital crime in Montana at the time — and the prosecutor recommended a 110 year sentence. Notwithstanding that recommendation, the Montana district court sentenced Munro to 60 years. Munro was released on October 10, 1998.

. Justice Stewart explained why ‘death is different’ in Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972):
The penalty of death differs from all other forms of criminal punishment, not in degree but in kind. It is unique in its total irrevocability. It is unique in its rejection of rehabilitation of the convict as a basic purpose of criminal justice. And it is unique, finally, in its absolute renunciation of all that is embodied in our concept of humanity.
Id. at 306, 92 S.Ct. 2726 (Stewart, J., concurring); see also Reid v. Covert, 354 U.S. 1, 77, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957) (Harlan, J. concurring); Spaziano v. Florida, 468 U.S. 447, 490, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984) ("Every Member of this Court has written or joined at least one opinion endorsing the proposition that because of its severity and irrevocability, the death penalty is qualitatively different from any other punishment, and hence must be accompanied by unique safeguards to ensure that it is a justified response to a given offense.”) (Stevens, J., dissenting in part).

. It warrants noting that Doran had never worked on a capital case before. See Hamilton v. Ayers, 583 F.3d 1100, 1114 (9th Cir.2009) (finding ineffective assistance where defense counsel had never worked on a capital case before and failed to associate co-counsel).

. Constructive denial has been found, for example, where an attorney forgot to file a notice of appeal, Lozada v. Deeds, 498 U.S. 430, 432, 111 S.Ct. 860, 112 L.Ed.2d 956 (1991), conceded that there was no reasonable doubt as to defendant’s guilt, United States v. Swanson, 943 F.2d 1070, 1074 (9th Cir.1991), and slept through a substantial portion of the trial, Javor v. United States, 724 F.2d 831 (9th Cir.1984).

. Even if his testimony could be taken into account, it should not be given any weight; at the re-sentencing hearings on May 3, 1983, and December 1, 1983, Smith admitted that he exaggerated his testimony at the first plea hearing in order to improve his chances of being sentenced to death.

. The majority also cites Lambert v. Blodgett, 393 F.3d 943 (9th Cir.2004), for the proposition that prejudice does not exist where a defendant chooses to plead guilty. See Maj. Op. at 991. In Lambert, the Ninth Circuit did not hold that a defendant's wish to plead guilty was dispositive of prejudice, only that the Washington state court’s holding that there was no prejudice because the defendant plead guilty for his own reasons was not “contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.” Id. at 980. Accordingly, AED-PA required deference to the state court. AEDPA does not apply here.

. Surprisingly, death penalty "volunteers” like Smith and Langford are not uncommon. According to one study, approximately 12% of those executed between 1977 and 2003 have been willing volunteers. See John H. Blum, Killing the Willing: “Volunteers, ” Suicide and Competency, 103 Mich. L. Rev. 939, 939-940 (2005). Less surprisingly, defendants who initially "volunteer” frequently change their minds. Richard J. Bonnie, Mentally III Prisoners on Death Row: Unsolved Puzzles for Courts and Legislatures, 54 Catholic U. L. Rev. 1169, 1189-92 (2004-2005).

. See Johnson v. Bredesen, - U.S. -, 130 S.Ct. 541, 542, — L.Ed.2d - (2009) (Stevens, J., dissenting from denial of cert.) ("[M]y strongly held view [is] that state-caused delay in state-sponsored killings can be unacceptably cruel.”); Knight v. Florida, 528 U.S. 990, 993, 120 S.Ct. 459, 145 L.Ed.2d 370 (1999) (Breyer, J., dissenting from denial of cert) ("Where a delay, measured in decades, reflects the State’s own failure to comply with the Constitution's demands, the claim that time has rendered the execution inhuman is a particularly strong one.”); Elledge v. Florida, 525 U.S. 944, 119 S.Ct. 366, 142 L.Ed.2d 303 (1998) (Breyer, J., dissenting from denial of cert); Lackey v. Texas, 514 U.S. 1045, 1045, 115 S.Ct. 1421, 131 L.Ed.2d 304 (1995) (Stevens, J., dissenting from denial of cert.) ("Though novel, petitioner's claim is not without foundation.”).