**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

RONALD R. WEAVER,
    *Petitioner-Appellee,*

v.

JOAN PALMATEER,
    *Respondent-Appellant.*

No. 04-36009

D.C. No.
CV-99-01045-GMK

RONALD R. WEAVER,
    *Petitioner-Appellee,*

v.

JOAN PALMATEER,
    *Respondent-Appellant.*

No. 04-36020

D.C. No.
CV-99-01150-JMS

OPINION

Appeal from the United States District Court
for the District of Oregon
Garr M. King, District Judge, Presiding

Argued and Submitted
December 7, 2005—Portland, Oregon

Filed July 17, 2006

Before: James R. Browning, Dorothy W. Nelson, and
Diarmuid F. O'Scannlain, Circuit Judges.

Opinion by Judge O'Scannlain

7871

## COUNSEL

Janet A. Klapstein, Assistant Attorney General, Salem, Oregon, argued the cause for the respondent-appellant; Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General, were on the briefs.

Anthony D. Bornstein, Assistant Federal Public Defender, Portland, Oregon, argued the cause for the petitioner-appellee.

## OPINION

O'SCANNLAIN, Circuit Judge:

In this case we must decide whether an Oregon state prisoner is entitled to a writ of habeas corpus on the basis of ineffective assistance of counsel in connection with his rape and sodomy convictions in 1983.

I

On August 30, 1982, authorities in Clackamas County, Oregon arrested Petitioner Ronald Weaver on suspicion that he had committed some 20 to 30 rapes between December 1981 and August 1982. Weaver was accused of being the "T-Shirt Rapist," a serial offender whose distinctive *modus operandi* was to target lone women, to break into their homes, and to commit sexual assault under threat of violence while covering his head with a T-shirt or other article of clothing. The assailant would then force the victims to lie face down; he would cover them with a blanket and then flee the scene.

The police identified Weaver as the culprit when, in an aborted rape attempt, the intended victim followed the assailant out of the house and wrote down the license plate number of his departing vehicle. The plates were registered to Weaver's sister. Subsequently, police determined that fingerprints left on one victim's sliding glass door belonged to Weaver.

Weaver retained Nick Chaivoe, an experienced criminal defense attorney, as trial counsel.[1]

A

Police investigators arranged for two pretrial lineups. The first was a photographic lineup, at which none of the witnesses could identify Weaver as the culprit. The second was a live lineup, which the authorities initially postponed because a local newspaper had published Weaver's photograph and identified him as a suspect in the sexual assaults. At the rescheduled lineup, Chaivoe questioned each of the witnesses as to whether their ability to identify the culprit had been influenced by the newspaper publication. Only one had seen the photograph, and she denied any taint or compromise. At least four of the victims then identified Weaver as their rapist.

During a pretrial psychological interview, Weaver admitted to raping "a number of women in a variety of fashions." Initially, Chaivoe considered the possibility of a defense based on "mental disease or defect." Chaivoe's investigation of this possibility took into account evaluations by several medical professionals: Drs. Henry Dixon, Norman M. Janzer, Robert A. Maricle, and Kenneth Paltrow, all psychiatrists, and Peter V. Okulitch, a clinical psychologist.

According to Chaivoe, Weaver ultimately directed him "to

---

[1]At an early point in the representation, Weaver found himself no longer able to pay for Chaivoe's services. However, Chaivoe continued as counsel on the basis of a court appointment.

negotiate a plea with the district attorneys to get him the best deal possible." Chaivoe negotiated an agreement, and on January 11, 1983, Weaver pled guilty in Clackamas County to one count of first-degree rape and one count of first-degree sodomy. On January 20, 1983, he pled guilty in Multnomah County, Oregon, to one count of first-degree rape and one count of first-degree attempted sodomy. The plea bargain included the agreement of prosecutors in the two Oregon counties and two counties in the State of Washington to forego any other charges against Weaver. In total, there were at least 19 other known victims upon whose testimony the authorities might have prosecuted Weaver.

B

On January 24, 1983, the Oregon State Hospital ("OSH") Mental Health Division admitted Weaver for evaluation for sexual dangerousness and a recommendation of treatment.

The OSH evaluation disclosed Weaver's repeated admission that he had committed about 30 rapes. The report's conclusion was that Weaver "poses an extreme sexual danger to the community without intensive treatment in a highly structured environment." However, the report acknowledged that "[b]ecause of the seriousness of his multiple charges, it is unlikely that probationary treatment . . . will be deemed feasible."

The state circuit courts received the report on March, 17, 1983. The next day, according to the presentence report, Weaver "made the decision to fire his attorney, withdraw his plea and [was] considering entering pleas of not guilty by reason of insanity." Weaver filed a motion to discharge Chaivoe as counsel on March 22. Before withdrawing, Chaivoe filed motions on Weaver's behalf seeking to withdraw his guilty pleas or continue sentencing.[2]

---

[2]Chaivoe served as Weaver's attorney from late 1982 until April 1983. He died on September 23, 2000.

C

Michael Clancy was then substituted as Weaver's counsel. On May 24, 1983, Clancy filed an amended motion on behalf of Weaver to withdraw his guilty pleas on the ground that Chaivoe's representation was constitutionally inadequate.

The Clackamas County Circuit Court plea-withdrawal hearing took place on May 27, 1983, before Judge Patrick Gilroy. Weaver argued that Chaivoe coerced his original plea by threatening that otherwise Weaver would be prosecuted for all of the suspected rapes and would receive "a minimum of eighty years in the penitentiary." Chaivoe described the steps he took while representing Weaver, and he indicated that he spent an unusually large amount of time on Weaver's case "because of the nature and complexity of the problems that were involved." Chaivoe claimed that he did not recommend, much less coerce, Weaver's guilty pleas.

Judge Gilroy denied the motion to withdraw the guilty plea. Given that Weaver could have been charged with many more counts of rape, the judge held, *inter alia*, that the result obtained in the case evidenced the adequacy of Chaivoe's representation.

D

Clancy also filed a motion to withdraw Weaver's guilty plea in the Multnomah County Circuit Court. On June 30, 1983, Judge Robert P. Jones presided over a hearing on the motion. Weaver offered testimony from Patrick Birmingham and Robert R. Selander, two local defense attorneys, who suggested that Chaivoe's representation of Weaver had been inadequate in several respects.

Judge Jones denied Weaver's motion to withdraw the guilty plea. The judge concluded that Chaivoe's assistance was not ineffective because he was following Weaver's directions. In

so finding, he credited the out-of-court statements offered by the State's attorney and Chaivoe's Clackamas County testimony with respect to the facts of his representation of Weaver.

### E

On July 7, 1983, the Clackamas County court sentenced Weaver to two consecutive 20-year sentences with 10-year minimums for the rape and sodomy counts. On August 1, 1983, the Multnomah County court sentenced Weaver to 20 years for the first-degree rape count and 10 years for the first-degree attempted rape count. The counts carried minimums of 10 and 5 years, respectively. The sentence for attempted rape was to run concurrently with a 10-year sentence for first-degree attempted sodomy.

The Multnomah County court decreed that its sentence would run consecutively to the Clackamas County sentence. Thus, the total sentence imposed was 70 years imprisonment with a minimum of 35 years.

### F

In 1984, Weaver directly appealed both sentences. The Oregon Court of Appeals affirmed the trial court judgments without opinion. *See State v. Weaver*, 67 Or. App. 536, 678 P.2d 782 (1984). Weaver did not pursue an appeal to the Oregon Supreme Court. The convictions thus became final on May 3, 1984. *See* Or. R. App. P. 10.05 (1984).

In 1991, Weaver filed a petition for post-conviction relief in the Circuit Court of Marion County, Oregon.[3] Before Judge Pamela L. Abernethy, Weaver argued that Chaivoe provided

---

[3]The petition was initially dismissed as untimely, but the State conceded this was error and the Court of Appeals remanded the petition for trial. *State v. Weaver*, 116 Or. App. 54, 838 P.2d 647 (1992).

ineffective assistance; that his guilty pleas were not knowing or voluntary; that the terms of the plea agreement had been violated; and that the district attorney had engaged in misconduct.

Judge Abernethy denied Weaver's petition on August 29, 1996. She noted that Judges Gilroy and Jones, many years earlier, had heard much of the same evidence then before her. The judge concluded that Judge Gilroy's reasoning was persuasive and that Weaver had failed to meet his burden of proving ineffective assistance of counsel.

The Oregon Court of Appeals affirmed without opinion and the Oregon Supreme Court denied review. *See Weaver v. Maass*, 157 Or. App. 600, 972 P.2d 1231 (1998), *rev. denied* 328 Or. 365, 987 P.2d 511 (1999).

## G

Weaver filed these petitions for writs of habeas corpus in the District of Oregon on July 23, 1999, challenging his guilty pleas in both the Clackamas and Multnomah County convictions.[4] He alleged the denial of adequate assistance of counsel on several grounds, as well as other claims not relevant here.[5]

On July 28, 2003, United States Magistrate Judge Janice M. Stewart issued her Findings and Recommendation that Weaver's petitions be granted and that he be retried. Subsequently,

---

[4]The State does not raise the statute of limitations bar on AEDPA filings made beyond one year of a petitioner's conviction in state court. *See* 28 U.S.C. § 2244(d)(1). We note that Weaver's convictions became final in 1984 and these petitions were not filed until July 23, 1999. We assume, without deciding, that Weaver's post-conviction relief filings in various state courts tolled, equitably or otherwise, the statute sufficiently to permit a timely filing under AEDPA.

[5]Weaver does not argue on appeal *all* of the issues raised in his habeas petition—namely, the claims of error by the trial court and misconduct by the prosecutor. We consider such claims to have been waived.

District Court Judge Garr M. King entered orders granting habeas relief based on the Magistrate's Findings and Recommendation in both cases, ordering the State "to take Weaver to trial within 180 days or release him from custody." The State filed timely notices of appeal and we consolidated both cases for argument and disposition.[6]

---

[6]We review de novo the district court's grant of habeas relief. *Leavitt v. Arave*, 383 F.3d 809, 815 (9th Cir. 2004) (citation omitted). Of course, our review of the petition is guided by the Antiterrorism and Effective Death Penalty Act ("AEDPA") and its prescription of deference to the final judgments of the state courts. *See, e.g.*, *Lounsbury v. Thompson*, 374 F.3d 785, 787 (9th Cir. 2004). Under AEDPA, a federal court may overturn a state conviction on a question of law or mixed question of law and fact only where the state court's decision was "contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court." 28 U.S.C. § 2254(d)(1); *see Williams v. Taylor*, 529 U.S. 362, 407-09 (2000).

As to questions of historical fact, habeas relief is inappropriate unless the state court decision was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). We apply subsection (d)(2) because it pertains to an "intrinsic analysis" of the state court's fact-finding process, *i.e.*, "where petitioner challenges the state court's findings based entirely on the state record." *Taylor v. Maddox*, 366 F.3d 992, 999-1000 (9th Cir. 2004). In *Taylor v. Maddox*, we observed that what § 2254(d)(2) "teaches us is that, in conducting this kind of intrinsic review of a state court's processes, we must be particularly deferential to our state-court colleagues." *Id.* at 999-1000 (citing *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003)); *accord Lambert v. Blodgett*, 393 F.3d 943, 972 (9th Cir. 2004).

The burden of proof rests with the petitioner. *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002). In assessing Weaver's habeas claims, we analyze the last reasoned state decision. *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991); *Barker v. Fleming*, 423 F.3d 1085, 1090 (9th Cir. 2005). Ordinarily, AEDPA contemplates review of a single state court opinion. However, Judge Abernethy's 1996 decision substantially adopted the reasoning employed by Judges Gilroy and Jones in their 1983 decisions denying Weaver's motions for withdrawal of the guilty pleas. Thus, we also consider those decisions to the extent they illuminate the basis for the 1996 decision. *See Barker*, 423 F.3d at 1093.

## II

Before considering the parties' contentions, we take a closer look at the record developed in the Oregon court proceedings. There are many instances in the record in which a statement by Weaver flatly contradicts one by Chaivoe. Given such contradictory testimony and the nature of the accusations made by Weaver, the fact that the state courts, three times, rejected Weaver's claim that Chaivoe's representation was ineffective strongly indicates these courts found Chaivoe credible and Weaver not. *See Marshall v. Lonberger*, 459 U.S. 422, 433-34 (1983) ("[B]ecause it was clear under the applicable federal law that the trial court would have granted the relief sought by the defendant had it believed the defendant's testimony, its failure to grant relief was tantamount to an express finding against the credibility of the defendant." (citing *Lavallee v. Delle Rose*, 410 U.S. 690 (1973))); *accord Knaubert v. Goldsmith*, 791 F.2d 722, 727 (9th Cir. 1986) ("[N]ot every finding of fact need be stated on the record in infinite detail and clarity. In certain circumstances we will recognize that a factual determination is implicit in the actions taken by a state court.").[7]

---

[7]Though perhaps not an explicit credibility determination, we note further support for an implicit one in Judge Gilroy's conclusion that Weaver simply came to regret the plea bargain after realizing his sentence would not be what he had hoped. The judge stated:

> I find it difficult for me to believe that there is a great deal of substance in a Johnny-come-lately complaint about Mr. Chaivoe, after the presentence report has been received and you're aware now that the presentence writers are recommending incarceration, as to the competency of Mr. Chaivoe. . . . And to blacken the name of a veteran attorney in an effort to avoid what you now may feel is a potential imprisonment, I think that speaks little of your character.

Transcript of Proceedings, Motion to Withdraw, *State v. Weaver*, Nos. 82-688, 82-801, at 111 (Cir. Ct. Clackamas Co. May 27, 1983).

It is true that Judge Gilroy expressed disapproval that Weaver had waited to file the motion until after the presentence report was received,

Although we are empowered to overturn a state court's credibility determination, *see Taylor*, 366 F.3d at 1000 (citing *Miller-El v. Cockrell*, 537 U.S. 322 (2003)), we see no need to do so here. Weaver has pointed to nothing in the record that would indicate the state courts' acceptance of Chaivoe's testimony was erroneous, much less that it was objectively unreasonable. *See Rice v. Collins*, 126 S. Ct. 969, 976 (2006) ("Reasonable minds reviewing the record might disagree about the prosecutor's credibility, but on habeas review that does not suffice to supersede the trial court's credibility determination.").

An important aspect of Chaivoe's credible testimony was his account of Weaver's decision to plead guilty. Chaivoe reported that Weaver's plea was motivated, in substantial part, by his strongly held personal desire to avoid the publicity, trauma, and sentencing exposure of multiple rape trials. *See, e.g.*, Transcript of Proceedings, Motion to Withdraw, *State v. Weaver*, Nos. 82-10-37650, 82-10-37682, at 131-33 (Cir. Ct. Multnomah Co. June 30, 1983) (quoting Chaivoe's testimony, which was that Weaver's "primary reason" for pleading guilty was "that he did not want the victims to be exposed to the publicity of trial. . . . He acknowledged responsibility to me [and] . . . he just felt that the whole thing should be dropped.").[8] We discuss this evidence and its relevance further below.

---

but, as the magistrate judge pointed out, "[t]he presentence report, itself, notes that petitioner had already decided to withdraw his guilty pleas at the time that report was drafted." But this was of no consequence. The OSH report acknowledged the improbability of probationary treatment, thus informing Weaver that he would not get the sentence for which he was allegedly hoping. Weaver knew what was in the report because, according to the record evidence, the doctors disclosed its contents to him. Judge Gilroy correctly posited that *someone* had recommended against probation; it hardly matters that he named the wrong report.

[8]Certainly Weaver had other concerns, such as the length of incarceration to which he would be resigning himself. It is also not surprising that Weaver would have at least inquired about possible defenses before then deciding to plead guilty. As Chaivoe reported, "after considering all of the factors involved, it was [Weaver's] own decision to enter a plea of guilty." Transcript of Proceedings, Clackamas County Motion to Withdraw, at 45.

## III

In general, the State argues that Weaver failed to meet his burden of showing constitutionally inadequate counsel prior to entry of the guilty pleas. Weaver alleges various deficiencies in Chaivoe's counsel.

[1] The Supreme Court set forth the standards for deciding a claim of ineffective assistance of counsel in *Strickland v. Washington*, 466 U.S. 668 (1984). Weaver must show (1) that Chaivoe's conduct was not "the result of reasonable professional judgment"; and (2) that Chaivoe's "deficient performance prejudiced the defense." *Id.* at 687-90.[9]

## A

Weaver's first allegation is that Chaivoe rendered ineffective assistance by failing to ensure that the guilty pleas were

---

[9]The first *Strickland* prong requires the petitioner to show that counsel's advice was not within "the wide range of professionally competent assistance," *id.* at 690, and instead " 'fell below an objective standard of reasonableness,' " *Hill v. Lockhart*, 474 U.S. 52, 56-57 (1985) (quoting *McMann v. Richardson*, 397 U.S. 759, 771 (1970)). There is a strong presumption that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Strickland*, 466 U.S. at 690.

The second prong requires a showing that "there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* Where the alleged errors involve counsel's advice resulting in a guilty plea, "the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill*, 474 U.S. at 59.

Under AEDPA, we review for objective unreasonableness the state court's conclusions as to whether counsel's performance was deficient or resulted in prejudice. *Lambert*, 393 F.3d at 978. We review the underlying factual determinations for unreasonableness in light of the record evidence. *Id.*

knowingly and voluntarily entered. In these habeas petitions, Weaver asserted two specific reasons why his guilty pleas did not comport with due process: Chaivoe allegedly suggested to him that he could be sentenced to probation; and he allegedly told Weaver that his Multnomah County sentence would run concurrently with the Clackamas County sentence.[10]

Even if Chaivoe were to have erred in advising Weaver that he could receive probation and, at worst, would receive a concurrent sentence in Multnomah County, we "must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors." *Strickland*, 466 U.S. at 696. We are well-advised to bypass scrutinizing a criminal-defense attorney's representation if the defendant cannot show that he was prejudiced by it. *See id.* at 697.

---

[10]Weaver also contends that Chaivoe coerced his guilty plea and therefore it was involuntary. Specifically, he alleges that his attorney coerced the pleas by suggesting that otherwise he would "do a minium of eighty years" and would "be treated like the I-5 Bandit." (Randall Brent Woodfield, known as "the I-5 Bandit," was sentenced in 1981 to life in prison for the murder of a Salem, Oregon woman.) But Chaivoe explained that the comment was simply relayed from the district attorney's office and was meant to express the fervor with which the State was likely to prosecute Weaver should he decline their plea offer. The case had already generated some press coverage and Chaivoe made the assessment that the State would not "pull any punches."

Moreover, in response to a question as to whether Chaivoe told Weaver that he "had no chance and that he should agree to enter into the . . . plea offers," Chaivoe pointedly explained that he would have never recommended to Weaver, or any client, that he plead guilty. He stated, "I feel that the determination of entering a plea of guilty must be the accused's, not the attorney's. . . . I did not recommend to Mr. Weaver that he enter a plea of guilty. *I did tell him what the options were*." Transcript of Proceedings, Clackamas County Motion to Withdraw, at 41-42 (emphasis added).

Given the state court's reasonable credibility determination, Weaver cannot show that Chaivoe's counsel coerced his decision to plead guilty.

1

**[2]** In assessing prejudice, we do not ask what a defendant might have done had he benefitted from clairvoyant counsel. *See id.* at 689; *see also Campbell v. Wood*, 18 F.3d 662, 673 (9th Cir. 1994) ("Our review of counsel's performance is highly deferential. . . . We will neither second-guess counsel's decisions, nor apply the fabled twenty-twenty vision of hindsight."). As such, we disagree with the magistrate judge's reasoning that Weaver was prejudiced because "it turned out" that the Multnomah County judge imposed a prison sentence consecutive to the one already given in Clackamas County. Instead, we consider whether there is a reasonable probability that Weaver would have proceeded to trial had he been given proper advice from counsel. *See Hill*, 474 U.S. at 60. The prejudice inquiry is therefore not divorced from the content of minimally competent advice.

**[3]** The most prudent advice in this case was precisely that which Chaivoe alleged he gave: (1) a probationary sentence was technically possible but not at all probable;[11] and (2) a

---

[11] In testimony before the Clackamas County Circuit Court, Chaivoe acknowledged that he advised Weaver that, as a matter of legal technicality, it was possible that Weaver could receive a probation term in lieu of incarceration. His mentioning probation conveyed that there was some remote possibility, given the discretionary nature of sentencing in Oregon at that time, *see* OR. REV. STAT. § 137.010 (1981), that a court would find fit to ensure Weaver's receipt of psychological treatment "because of his problem." But this suggestion came with a clearly worded disclaimer. Chaivoe testified, "I told him . . . the Court might give him probation . . . but on the other hand the Court *probably would not*." Transcript of Proceedings, Clackamas County Motion to Withdraw, at 63 (emphasis added); *see also id.* at 99 ("I told him [probation] was not too reasonable."). Chaivoe further advised Weaver that "Multnomah County wanted the maximum from Clackamas County." *Id.* at 63.

*See Iaea v. Sunn*, 800 F.2d 861, 863-65 (9th Cir. 1986) (finding ineffective assistance of counsel where an attorney grossly mischaracterized the probable sentence by suggesting, on several occasions, that the defendant had "a good chance" of receiving probation and that the chance of an extended sentence was "almost zero," and yet the defendant received a life sentence).

concurrent sentence was probable in light of the plea agreement but ultimately dependent upon the sentencing judge's discretion.[12] We must assess in *that* light whether the record evidence suggests a reasonable probability that Weaver would otherwise have proceeded to trial.

2

**[4]** We note first that the prejudice requirement of *Strickland* and *Hill* requires Weaver to show that but for Chaivoe's alleged errors Weaver would have rejected the State's plea offer and insisted on facing trial on the four charged rapes in addition to perhaps 19 others. Clearly, absent the plea bargain, Weaver faced the possibility of a prison sentence considerably

---

[12]Chaivoe acknowledged telling Weaver that, according to the terms of the plea agreement, if Clackamas County sentenced him to the maximum term then Multnomah County would do the same, and that the sentences would run concurrently. Contrary to Weaver's assertion on appeal, however, Chaivoe also cautioned Weaver that he "could not guarantee anything." Transcript of Proceedings, Clackamas County Motion to Withdraw, at 45; *see also id.* ("I did my best to advise him on what *the probability* would be . . . ." (emphasis added)). In addition to indicating the probabilities, Chaivoe counseled Weaver as to what was *possible*. Weaver's own affidavit (submitted to the Marion County Circuit Court) acknowledges that "Mr. Chaivoe told me the sentence could be seventy years and that Clackamas County wanted minimums totaling twenty years."

Moreover, Chaivoe had ample reason to advise Weaver, in terms of a probability, that he *would* receive a concurrent sentence in Multnomah County. Chaivoe's advice was consistent with the terms of the plea agreement he had negotiated at Weaver's behest. The agreement stated, "If Clackamas County Circuit Court sentences me to 2 consecutive 20 year terms with 10 year minimum on each, for a total of 40 years w/ minimum of 20 years, Multnomah County will recommend concurrent sentences on these charges."

*See Iaea*, 800 F.2d at 865 (holding that ineffective assistance occurs only when the attorney grossly mischaracterizes the *likely* outcome of sentencing, not merely when, after the fact, the actual outcome reveals his prediction to have been inaccurate).

longer than the 20-year minimum term the plea bargain suggested he would probably receive.

The record also indicates that Weaver had "his own reasons for pleading guilty wholly aside from the strength of the case against him." *Cf. McMann*, 397 U.S. at 767. Weaver told his psychiatrist, Dr. Maricle, that he intended to plead guilty to the rapes to avoid causing trauma to his parents, wife, and children, and that he would "attempt to avoid a trial" so that his family "wouldn't have to go through this." He admitted to Dr. Janzer that he "thought about rape 'for a long time' before first doing it in 1978," and that he had thought about committing suicide in order to "spare his family adverse publicity." Dr. Janzer, reporting these facts to Chaivoe in a letter dated October 13, 1982, said that Weaver "repeatedly" expressed his desire to avoid the publicity of a trial. To Dr. Okulitch, Weaver indicated his "refus[al] to participate in any kind of trial procedure" so as to avoid causing his family pain. Dr. Okulitch reported these facts to Chaivoe in a letter dated November 8, 1982.

Weaver's intentions were no different when expressed directly to his attorney. According to Chaivoe, while out on bail pending trial, Weaver admitted to him that he "had committed all of the crimes alleged except for one." At the Clackamas County plea withdrawal hearing, Chaivoe reported that Weaver had acknowledged responsibility for the crimes and clearly "did not want the victims to be exposed to the publicity of trial. He did not want to put them through the trauma of trial." In addition, Chaivoe reported "that in view of the fact that there were all these other cases involved that would be dropped, including any chance of being tried in the State of Washington," Weaver preferred to plead guilty.

**[5]** In sum, the record indicates Weaver's desire to avoid multiple trials, confrontation by his many victims, public shame, and immeasurable harm to his family—and nothing in the record required the state court to have found otherwise.

*See Langford v. Day*, 110 F.3d 1380, 1387 (9th Cir. 1997) ("Langford's dogged insistence on pleading guilty most certainly has an effect on the determination whether different advice from [counsel] would have led to a plea of not guilty."). Thus, as in *Langford*, "[t]he fact that overshadows this case is that [the petitioner] strongly and repeatedly insisted on pleading guilty," *id.* at 1386, and we do not think that the state court was required to conclude that the proper advice noted above—reflecting the probability of Weaver's receiving a prison sentence with a 20-year minimum term— would have shaken Weaver's determination to avoid the difficulties of multiple public trials. *Compare Lambert*, 393 F.3d at 880 (noting that it was unlikely that counsel could have dissuaded the defendant from pleading guilty because he "chose to plead guilty on his own accord and for his own reasons"), *with Iaea*, 800 F.2d at 861 (noting a record "replete with evidence that Iaea was very reluctant to plead guilty and that defense counsel and Iaea's brother had a great deal of trouble convincing him to do so").

3

**[6]** In addition, we note that the trial courts warned Weaver that his sentencing may result in lengthy terms of imprisonment. Notwithstanding the plea agreement's recommendation of concurrent sentences, the Multnomah County judge stated, among other things, "I'm not prepared to indicate what I may do by way of penalty. But you understand that you may be sentenced to jail for as much time as is permissible under the law. Do you understand that?" Transcript of Proceedings, Plea Hearing, *State v. Weaver*, Nos. C82-10-37650, C82-10-37682, at 7 (Cir. Ct. Multnomah Co. Jan. 20, 1983). The trial courts also confirmed that Weaver had not been told what sentence the court would give him. *See* Transcript of Proceedings, Plea Hearing, *State v. Weaver*, Nos. 82-688, 82-801, at 6-7 (Cir. Ct. Clackamas Co. Jan. 11, 1983); Transcript of Proceedings, Multnomah County Plea Hearing, at 4-5, 8. Weaver thus "cannot establish prejudice from any bad advice he received,

because the judge told him point blank that he could not har-
bor any particular expectations about the sentence." *United
States v. Rice*, 116 F.3d 267, 269 (7th Cir. 1997); *see also
United States v. Boniface*, 601 F.2d 390, 393 (9th Cir. 1979)
(holding that a defendant was not prejudiced by counsel's
alleged misstatements because the court informed the defen-
dant that it was not bound by the plea agreement).

**[7]** Because Weaver cannot establish prejudice in light of
proper advice from counsel, the state court's rejection of his
argument that the pleas were rendered unknowing by defec-
tive counsel was not an objectively unreasonable application
of federal law.

### B

Weaver's next claim is that Chaivoe rendered ineffective
assistance in failing to advise him as to the strengths and
weaknesses of the prosecution's case or any defenses that he
might validly assert.

### 1

In contesting Weaver's allegations, Chaivoe testified that
he fully apprised Weaver of the merits of the cases against
him. Chaivoe reported that he "[t]old [Weaver] that he had a
chance," and further stated, "I would try the case, that was my
job, if he wanted me to try the case, I would." Chaivoe also
testified that he "told [Weaver he] could not recommend his
entering a plea of guilty, [and] that [they] could put on a
defense." As a result of this testimony, the state courts deter-
mined that Chaivoe fully apprised Weaver of his options.

As to the physical evidence such as blood, saliva, and
semen potentially linking Weaver to at least one crime scene,
Weaver made the rather startling allegation that Chaivoe bla-
tantly lied, telling Weaver that the tests resulted in positive
matches in order to coerce him into the guilty plea. In con-

trast, Chaivoe averred that he truthfully explained to Weaver the results of the relevant tests. He testified that he reported that the tests "were not conclusive of anything"—an accurate characterization—and that he thought that "they were not good identifications." Deposition of Nick Chaivoe, *Weaver v. State Penitentiary*, Nos. 150,784, 150,785, at 18-19 (Cir. Ct. Marion Co. Mar. 7, 1986).

**[8]** As we have already stated, the state court resolved these contradictions by rendering a credibility determination in favor of Chaivoe. On this record we find no basis on which we could possibly overturn that determination, it being due proper deference under AEDPA's § 2254(d)(2).

2

At the 1996 post-conviction proceedings in Marion County, Weaver submitted one new item of evidence: a telephonic deposition of Toni Lane, the former legal secretary to Chaivoe.[13] In general, Lane's opinion was that Chaivoe's negative attitude toward the court appointment, for which he was paid a below-market rate, resulted in poor representation of Weaver.

**[9]** Lane's testimony was entirely unhelpful to an assessment of Weaver's ineffective assistance claims, as she offered no testimony suggesting that Weaver had considered entering a plea of not guilty. We conclude that, in the context of the

---

[13]In these habeas petitions, Weaver argued that Judge Abernethy failed to consider Lane's testimony. But we think Judge Abernethy clearly considered the testimony offered by Lane, even "applaud[ing] her coming forward to testify in this case." Thus, although the failure to consider a key aspect of the record may result in an "unreasonable determination of the facts," *Taylor*, 366 F.3d at 1008, that Judge Abernethy did not find Lane's testimony "new and compelling" negates the very suggestion that she failed to consider it. There was no defect in the fact-finding process because the judge "discussed what light this testimony cast on the striking differences in the descriptions of the [representation] given by [Weaver] and [Chaivoe]." *Id.*

full record, Lane's testimony is neither "highly probative [nor] central to petitioner's claim," *Taylor*, 366 F.3d at 1001, because it in no way augmented his ability to prove he was prejudiced by any alleged errors by counsel.

3

Weaver also claims that Chaivoe failed to advise him that the witness identifications could be challenged at trial as unreliable or weak. Initially, we note that Weaver's citations to the record pertain to Chaivoe's belief that there was no legal basis to *exclude* the lineup identifications.[14]

[10] As we have already discussed, Weaver faced the possibility of rape charges in relation to as many as 19 additional victims, and he had a desire to avoid public trials for reasons largely independent of the merits of the cases against him. We are persuaded that Weaver has not shown prejudice as to this claim. There is no reasonable probability that a stronger suggestion by Chaivoe that the lineup identifications could be questioned would have inspired Weaver to face the full wrath of the States of Oregon and Washington in multiple rape trials. It was therefore not objectively unreasonable for the state court to reject this ineffective-assistance claim.

---

[14]We consider the issue of exclusion at *infra* Section III.E. There is no evidence that Chaivoe failed to perceive an available avenue of impeachment and, in any event, Weaver's decision to plead guilty precluded Chaivoe from pursuing those avenues. Although this decision and Weaver's corresponding directions to his attorney to negotiate a plea agreement "[do] not mean that [Weaver] loses his right to effective assistance of counsel," *Langford*, 110 F.3d at 1386, they appropriately and dramatically influenced the course of the defense. *See id.*; *accord United States v. Leonti*, 326 F.3d 1111, 1117 (9th Cir. 2003) (noting an attorney should not "fail to advise a client to enter a plea bargain when it is clearly in the client's best interest").

## C

Weaver's next claim was that Chaivoe rendered ineffective assistance of counsel by failing properly to investigate a defense based on a mental disease or defect. Weaver also alleged that Chaivoe lacked an accurate understanding of the Oregon insanity defense.[15]

Again, even if Chaivoe's counsel had been inadequate with respect to the mental-defect defense, Weaver must establish that he was prejudiced by the deficiency. As the Supreme Court explained in *Hill*, "where the alleged error of counsel is a failure to advise the defendant of a potential affirmative defense to the crime charged, the resolution of the 'prejudice' inquiry will depend largely on whether the affirmative defense likely would have succeeded at trial." 474 U.S. at 59 (citation omitted); *accord Lambert*, 393 F.3d at 984.

[11] Where, as here, there is direct testimony from one or more examining medical professionals that the insanity defense would have been unlikely to succeed,[16] we are hard-

---

[15]At the relevant time, the statute setting forth Oregon's insanity defense stated as follows:

> A person is not responsible for criminal conduct if, at the time of such conduct, as a result of mental disease or defect he lacked substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law.

OR. REV. STAT. § 161.295(1) (1981).

[16]In a 1986 deposition, Dr. Dixon explained that he did not recall having any expectation that he would testify at trial as to Weaver's mental condition. He stated, "I don't really recall — whether I would go to court or not on it. It would seem unlikely. It's not — *it's not very much to hang a defense on, in any sense*." (Emphasis added.) Additionally, Dr. Paltrow opined that Weaver suffered from depression and a personality disorder, "but not to the extent that he lacked substantial capacity either to appreciate the criminality of his conduct, or to conform his conduct to the requirements of the law." During an exchange between Dr. Paltrow and Chaivoe, the latter directly posed the question of an insanity defense, and Dr. Paltrow responded that "there wasn't enough there for [a not guilty by reason of insanity] defense."

pressed to find objectively unreasonable the state court's holding that no prejudice resulted from Chaivoe's failure further to develop or more strongly to recommend the defense.

Moreover, as the State suggests, there are additional reasons that an insanity defense was unlikely to supplant the plea bargain. First, the defense may have been subject to impeachment based on Weaver's previously having fabricated a seizure disorder in order to escape arrest for rape. *See* OR. REV. STAT. § 40.170(2)-(3) (1981). Second, an insanity defense would have had to overcome a statutory hurdle: the Oregon law provided that "the terms 'mental disease or defect' do not include abnormality manifested only by repeated criminal or otherwise antisocial conduct." *Id.* § 161.295(2). Third, the prospect of trial was unattractive because Weaver may have been subject to a "dangerous offender" statute, increasing the maximum penalty on each rape charge to 30 years. *Id.* §§ 161.725, 161.735. Finally, as already noted, the opportunity to escape prosecution and full-blown public trials on perhaps 19 additional charges of rape was a particularly strong inducement for the plea agreement.

Thus, for lack of prejudice, we conclude that the state court was not objectively unreasonable in rejecting this ineffective-assistance claim.

## D

Next, Weaver alleges that Chaivoe's counsel was inadequate because he failed to investigate the fingerprint evidence found on a sliding glass door which linked Weaver to the crimes. Weaver emphasizes that the fingerprint evidence was the only physical evidence at the prosecution's disposal.

Once again, even if Chaivoe's performance was constitutionally deficient, Weaver must show prejudice to warrant habeas relief. We again look to *Hill* for guidance:

> [W]here the alleged error of counsel is a failure to investigate or discover potentially exculpatory evidence, the determination whether the error "prejudiced" the defendant by causing him to plead guilty rather than go to trial will depend on the likelihood that discovery of the evidence would have led counsel to change his recommendation as to the plea. This assessment, in turn, will depend in large part *on a prediction whether the evidence likely would have changed the outcome of a trial.*

474 U.S. at 59 (emphasis added); *accord Hamilton v. Vasquez*, 17 F.3d 1149, 1157 (9th Cir. 1994) (citing *Strickland*, 466 U.S. at 694). In other words, where a petitioner cannot even make an unsubstantiated suggestion as to what the results of further testing would have been, there is no basis on which a reviewing court can find prejudice.

**[12]** Here the record provides no indication that further testing of the fingerprints would have yielded a different result, thereby inducing Chaivoe to alter his advice or shaking Weaver's decision to plead guilty. *See Langford*, 110 F.3d at 1386-87; *see also United States v. Berry*, 814 F.2d 1406, 1409 (9th Cir. 1987) ("Berry's second contention, that he was not allowed to call out-of-state witnesses, is also meritless. He offers no indication of what these witnesses would have testified to, or how their testimony might have changed the outcome of the hearing."). Indeed, it seems that further testing would have confirmed, rather than disproved, that the fingerprints belonged to Weaver. The police report indicated a match; Chaivoe could note five to seven points of identification by viewing the copy in his possession; and Weaver admitted to Chaivoe that he had touched the door from which the fingerprints were lifted.

We are satisfied that the state court's rejection of this ineffective-assistance claim was not objectively unreasonable.

E

Finally, Weaver claims that Chaivoe's counsel was constitutionally deficient because of his failure to file a motion to exclude the lineup identifications prior to Weaver's entry of the guilty plea. As noted, four or five of the victims in this case identified Weaver in a live pre-trial lineup, which occurred after Weaver's picture had been published in the newspaper indicating that he was suspected of the crimes.

We note that even prior to the lineup in question, Chaivoe obtained an injunction prohibiting the media from publishing photographs of Weaver until after the completion of the lineups. At the lineup, Chaivoe ensured that the police rearranged the participants and dressed Weaver in similar clothing. *See Moore v. Illinois*, 434 U.S. 220, 225 (1977) (noting that an attorney "can serve both his client's and the prosecution's interests by objecting to suggestive features of a procedure before they influence a witness' identification"). Chaivoe then questioned each of the victims who identified Weaver as to whether her identification may have been prejudiced by the published photograph.

Chaivoe stopped there, however, because, in part, he did not want to upend plea negotiations. Even Robert R. Selander, one of Weaver's expert witnesses, agreed with the State's suggestion that an attorney would not file a motion to suppress if it were in the client's best interests to negotiate the most favorable plea bargain possible. *See* Transcript of Proceedings, Multnomah County Motion to Withdraw, at 94 (agreeing with the suggestion that "you don't [file a motion] to suppress evidence, especially line-ups or identification evidence that you don't in essence get your cake and eat it, too? You don't get to try and suppress to see if it works, then get the same plea negotiation?"). Thus, in light of Weaver's desire to plead guilty and avoid multiple public trials, we consider this the kind of "strategic choice" that is "virtually unchallengeable." *Strickland*, 466 U.S. at 690; *cf. also Lang-*

*ford*, 110 F.3d at 1387 (noting that the attorney's conduct must be "viewed in the context of [the defendant's] insistence, at the time, that he wanted no motions to suppress or other types of delay to interfere with his intended plea of guilty").

**[13]** Chaivoe chose a reasonable approach to the lineup identifications: he attempted to prevent a prejudicial identification without filing an exclusionary motion that would likely have impaired Weaver's prospects for a favorable plea agreement. Thus, in rejecting this ineffective-assistance claim, the state court did not render an objectively unreasonable application of federal constitutional law.

IV

**[14]** We conclude that the state court's application of the Supreme Court's ineffective-assistance standards was, at the very least, not objectively unreasonable. Weaver has therefore failed to establish that he is entitled to a writ of habeas corpus.

The district court's grant of the writ is **REVERSED** and the case is **REMANDED** with instructions to dismiss the petition.